Estellene W. **TERRY**, Conservator for Steven W. Terry, and Estellene W. Terry, individually, Plaintiffs–Appellees,

v.

**PLATEAU ELECTRIC COOPERATIVE, Defendant–Appellant.**

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

Feb. 12, 1991.

Permission to Appeal Denied by Supreme Court Feb. 18, 1992.

Thomas M. Donnell, Jr., and M. Reid Estes, Nashville, for defendant-appellant.

W. Holt Smith, Madisonville, Thomas W. Phillips, Oneida, for plaintiffs-appellee.

## OPINION

WILLIAM H. INMAN, Special Judge.

A jury returned a verdict for $5,558,-875.00 as damages for personal injuries sustained by Steven C. Terry when a metal pole he was carrying came into contact with an overhead 7,200 volt power line owned and maintained by the defendant. A remittitur of $1,500,000.00 was suggested.

A veritable host of issues is presented for review, but in our opinion only one of them require discussion: the deliberate injection, by an expert witness called by the plaintiff, of the fact of insurance, upon which the verdict was clearly based according to the unrefuted affidavits of jurors.

The accident out of which this lawsuit arose occurred on July 15, 1987, when Steven Clark Terry was injured as a result of a metal pole approximately nineteen feet eight inches (19'8") in length which he was carrying came in contact with an overhead electrical power line owned by defendant Plateau Electric Cooperative. Steven Terry and his family were living in a trailer located on property owned by Steven Terry's father, Lesley Terry, in Oneida, Scott County, Tennessee. Lesley Terry and his wife lived in a house on the same property.

At the time of the accident, Steven was thirty-five years of age. He was a high school graduate and had taken college courses at Roane State Community College, University of Tennessee and Tennes-see Tech. He was an instructor of welding at a vocational school.

In September 1982, while they were living in the same trailer on the Lesley Terry property as they were at the time of the accident, Steven and Estellene moved a house onto the property. While in the process of renovating the house they applied for electrical service to it.

On September 3, 1982, five (5) years before the accident, Clyde Burchfield, an engineer at Plateau Electric Cooperative, with Arley Clayborn, an engineer's helper, went to the Terry property for purposes of "staking" the job in order to show the construction crew how the new electric lines should run. Both Lesley Terry and Steven Terry participated in the decision making as to where the lines and new poles would be installed. Steven walked the property with Clyde Burchfield and suggested that one of the new poles should be installed along a fence line and thus be out of the way, and a staking sheet was prepared by Arley Clayborn. The staking sheet refers to poles # 1, # 2, and # 3. Pole # 1 was already in existence. Poles # 2 and # 3 were new poles that had to be installed to provide the service to the renovated house.

The lines which were installed in September 1982 at the Terrys' request ran from pole # 1 to pole # 2 and from pole # 2 to pole # 3. There was a service line from pole # 3 to the house that was being renovated. The service line to the trailer in which Steven and his family were living was already in existence.

The new lines which were installed in September 1982 consisted of a "primary" line and a "neutral" line. The primary line is above the neutral line, and carries 7,200 volts. The neutral line cannot cause an electrical shock unless there is also contact with the primary line.

The area where the accident occurred is between pole # 1 and pole # 2. The house where Lesley and Maxine Terry lived is located on the opposite side of the lines from the trailer in which Steven Terry and his family lived.

The National Electrical Safety Code requires a twenty foot (20′) clearance for the primary line over residential driveways and requires the neutral line to have a ten foot (10′) vertical clearance over residential driveways. It is the practice of Plateau Electric to build its lines to insure at least 18 feet of vertical clearance to the neutral line and 22 feet of vertical clearance to the primary line. If the area under the line is a residential driveway, or if the area is to be used for agricultural purposes, the minimum vertical requirements of the National Electric Safety Code is twenty (20) feet. The proper spacing between the primary and the neutral lines required by Plateau Electric Cooperative is 4 feet. It was undisputed that the vertical clearance between the neutral and hot line was only thirteen inches on July 15, 1987, but this engineering error was not a contributing or proximate cause of the accident. Plateau Electric has an employee safety manual which requires all "outside employees" to be familiar with the basic requirements of the National Electric Safety Code and to "correct or report substandard conditions immediately". The National Electrical Safety Code at Section 420B requires that employees of public utilities shall report promptly to the proper authority lines or equipment defects such as "abnormally sagging lines".

According to Plateau Electric's standard practice, after the construction crew finishes its job, the lines are not inspected by engineering to determine if the vertical clearance requirements are met, and on the Terry job there was no actual measurement of the vertical clearance of the primary and neutral lines from the time the line was constructed until the date that Steve was injured. There was no maintenance order or any report of any problem with vertical clearance or abnormal sag at Steve Terry's property before his injury.

The new line that was installed in September of 1982 served only the new house. From September 1982 until July 15, 1987, this 7,200 volt line only delivered 13 kilowatt hours of electrical usage to the house being renovated.

There was evidence from which the jury might conclude that on July 15, 1987, Steve Terry was playing ball with his two sons, Wade and Brandon, in front of the trailer where he lived. Wade Terry asked his father to try to get a football out of the cedar tree in front of the trailer. The cedar tree was located directly underneath the lines running between poles one and two. Steve went over to his father's house to get the pole, put it together, and dragged it under the lines over to the tree. He was poking at the ball in the tree when sparks flew from the lines, and almost immediately he fell back. When he fell to the ground, the pole fell on top of him and Wade grabbed the pole. When he received the initial shock, Steve's hands were half way up the pole, and the bottom of the pole was on the ground.

Plateau Electric personnel came to the premises the night of July 15, 1987, but made no repairs to the line. The linemen noted the improper spacing between the neutral and primary lines, since it was considerably less than four feet. A witness who visited the scene on the morning following the accident testified that there were burn marks on the lines toward the trailer and estimated that the neutral line was 14 to 15 feet above the ground and the primary was approximately 1 foot above that.

On July 16, 1987, Plateau Electric sent Clyde Burchfield, Linda Lay, Tommy Lloyd, and Lillard Keeton to investigate this injury and to make the necessary repairs. Mr. Burchfield, who at that time was Senior Engineer, apparently was in charge of the investigation and made several measurements. Before any repairs were made to the line, he measured the neutral line as having a vertical clearance of 21 feet 9 inches and the primary line as having a vertical clearance of 22 feet 10 inches. He also measured the antenna pole Steven was using and noted that the pole was 21 feet long. He testified that every person present on July 16, 1987 verified that the pole was twenty-one feet long. The pole Steven was carrying consisted of two ten-foot sections of antenna which, when placed together, overlap approximately

four inches and when assembled is nineteen feet eight inches (19′8″) long. Burchfield admitted that the lines were only thirteen inches apart, which is contrary to Plateau's standard of four feet. Both the neutral and primary lines had been damaged extensively by arcing and thus repairs were necessary. There was evidence that because of the repairs the vertical clearance of the energized line was therefore less than 20 feet.

Dr. William Mazer, an electrical engineer, testified that the National Electrical Safety Code vertical clearance requirements are for the purpose of protecting the public. The fact that a driveway was shown on the staking sheet would mandate a minimum vertical clearance of 20 feet. There was evidence that the area under the lines is considered an area traversed by vehicles, and that it falls within the category of cultivated, grazing, forest, and orchard land which the lines cross.

James E. Geiger, an electrical engineer with actual experience designing distribution systems for both private corporations and public utilities, testified for the plaintiffs. He testified that the designer of a high voltage electrical line has the responsibility to consider possible uses of the property, and the lay of the land, and has the duty to insure property vertical clearance of the lines considering all activities that may occur beneath them. Specifically, the designer must consider the topography of the land in determining the safest place to install the line. Because these lines carry 7,200 volts and are not insulated, they must be designed and maintained to protect the public. This is one reason most utilities set their own standard for minimum vertical clearance for the primary, or hot line. It was Geiger's opinion that although twenty feet was the minimum required by the National Electrical Safety Code at the location where Mr. Terry was injured the vertical height of the primary line was only 17.56 feet.

During Mr. Geiger's testimony on behalf of plaintiffs, he was asked the following question by plaintiffs' attorney;

Q  Let me ask you if, Mr. Geiger, you have in the past in litigation matters been retained by the defendant on occasion?

A  Yes–sir, by its insurance carrier.

Q  Plateau Electric?

A  That's correct.

The defendant moved for a mistrial on the grounds that Geiger's testimony that he had been employed previously by defendant Plateau Electric Cooperative's insurance carrier was prejudicial, stressing that, pursuant to a Motion in Limine, the Court had entered an Order stating in part:

It is ordered that there shall be no evidence submitted or mention made by the parties in the trial of this cause in any respect regarding liability insurance coverage and further that the parties and their counsel are instructed to caution their witnesses that no reference regarding liability insurance coverage shall be made at the trial of this case.

In support of the Motion for mistrial, it was noted that during the discovery deposition of Geiger he testified that in the past he had been retained by the insurance carrier for Plateau Electric Cooperative. Notwithstanding knowledge of that fact plus the fact that the Trial Court had entered an order precluding any mention of insurance by counsel, parties or witnesses, the same question was asked of Mr. Geiger and he predictably responded that he had been retained previously by defendant's insurance carrier. The Court overruled defendant's motion for a mistrial stating:

It's out, but I'll overrule the motion. We'll just have to wait and see whether it's prejudicial or not.

The motion for a new trial was supported by the affidavits of three jurors. Juror Hicks testified that insurance was a major part of the deliberations and that one juror commented that Plateau Electric Cooperative's insurance carrier would not miss Five Million Dollars ($5,000,000.00) and that the insurance company would not have to pay it all at once. Another juror brought in a definition of negligence from an encyclopedia. Another juror commented on an Andy Griffith show to support the proposition

that sometimes "you just have to break the law".

Juror Shirley D. Baker confirmed that one juror brought an encyclopedic definition of negligence and argued from this that Steven Terry was not at fault. She further confirmed that another juror recited an Andy Griffith episode for the proposition that the law should be ignored in order to take care of Steven Terry. She further testified that another juror stated that the corporation always "gets over on the individual and I am not going to let it happen this time". She further testified that one juror came to deliberations and stated that she "had checked nursing home standards and that nursing homes would not take Steven Terry because he was mentally and physically retarded and not old enough and that that was the state law". Ms. Baker further testified that since everyone said that Plateau Electric Cooperative would not be hurt and that their insurance would step in and take over the payment of the judgment a little bit every year and not in one payment and because of the sympathy for Steven Terry, she voted to take care of him.

Juror Robin Krahn testified that during deliberations on Wednesday, January 24, the jury was split eleven to one (11-1) in favor of defendant Plateau Electric Cooperative. One juror held out and when the jurors reconvened the next morning, the discussion was centered on insurance coverage and who would take care of Steven Terry. She said that there was no attempt by the jury as a whole to determine or decide how the accident happened and no attempt to decide whether Steven Terry walked into the lines with the pole in the air or whether he had the pole in the tree jabbing for the ball. One juror commented that a little girl had fallen in her front yard and that her insurance had paid for it and that that was the reason "you had insurance". Ms. Krahn further testified that the majority of the jurors felt that Steven Terry was contributorily negligent, but because of a concern over who would take care of him and a belief that Plateau Electric Cooperative had insurance coverage, they decided to give Steven Terry a judg-ment. She also confirmed that one of the jurors brought a definition of negligence from an encyclopedia into the jury deliberation room and argued from that definition that Steven Terry was not negligent. Another juror stated that she had been to the Terry property and commented to the jurors during deliberation as to whether or not there was a driveway present. Ms. Krahn finally testified in her affidavit that:

> Although my honest conviction was and is that Steve Terry was contributorily negligent, I finally gave in and agreed to the verdict because of the peer pressure, (I was called "Aunt Bea" by some of the jurors who were apparently referring to an episode of Andy Griffith where Aunt Bea was a hold-out on a jury), and because of sympathy and the fact that there was insurance coverage.

Plaintiffs submitted no affidavits of jurors in rebuttal.

█ The appellee argues that insurance was inadvertently mentioned by one of its expert witnesses, whose testimony we have reproduced, which is not an adequate ground for a mistrial, citing *Colwell v. Jones*, 48 Tenn.App. 353, 346 S.W.2d 450 (1960). We agree that any reference to liability insurance must have been wilfully made for the purpose of influencing the jury. *Lovin v. Stanley*, 493 S.W.2d 725 (Tenn.App.1973). The reference to insurance, standing alone, can be rationalized; but we cannot ignore the proceedings thereafter.

We think the fact of insurance was rather adroitly brought to the jury's attention. The witness Geiger was asked the same question he was asked at discovery. His answer was the same in both instances. The response has indicia of conditioning, which may be of significance in light of the fact that Geiger had been instructed not to mention insurance. The question appears to be pointless except for the answer thereby elicited. That the jury was influenced by the presumption of insurance cannot be doubted, as evidenced by the testimony we have summarized. We do not agree, as the appellee argues, that Rule 606(b) precludes

our consideration of any part of these affidavits. It appears to us that the verdict was essentially predicated, not on the facts, but on liability insurance, an extraneous matter. See, *Goss v. Hutchins*, 751 S.W.2d 821 (Tenn.1988). *Marshall v. North Branch Transfer Co.*, 166 Tenn. 96, 59 S.W.2d 520 (1933); *Lovin v. Stanley*, 493 S.W.2d 725 (Tenn.App.1973); *Woods v. Meacham*, 46 Tenn.App. 711, 333 S.W.2d 567 (1959). Rule 411, *Tennessee Rules of Evidence*.

We think that Rule 606(b) precludes consideration of most of the jurors' testimony. See, *State v. Blackwell*, 664 S.W.2d 686 (Tenn.1984). As we have stated, only extraneous prejudicial information, outside influence, and an antecedent agreement to be bound by a quotient or majority result may be proved by the testimony of the jurors. But this record reveals an astonishing amount of extraneous prejudicial information: (1) That Plateau Electric Cooperative insurance carrier would not miss five million dollars; (2) that the insurance company would not have to pay it all at once; (3) a juror brought a definition of negligence copied from an encyclopedia, and argued that according to this definition Steven was not at fault; (4) a juror stated to fellow jurors that she had checked nursing home standards and because Steven was mentally and physically retarded and not old enough these nursing homes would not accept him, and "this was state law".

Jurors do not live in vacuums. They are encouraged to use their common sense and to rely upon their life experiences in evaluating a lawsuit. As all experienced trial lawyers and judges know, verdicts are not always representative of the views of all jurors; they frequently reflect the well-held views of only one or two forceful jurors, and when this happens, the non-assertive jurors will sometimes come forward later and complain that the verdict did not represent their views. Such stultification cannot be allowed, for obvious reasons, even when it appears in hindsight that the verdict was unjust. The developed law does not permit afterthoughts by jurors. See, *Berry v. Conover*, 673 S.W.2d 541 (Tenn.App.1984). But the jury room is not sacrosanct. A jury is sworn to decide the case on the law and facts adduced in Court, and if they forswear themselves the system does not work. A plaintiff may be accorded full justice within the established rules of fairness.

■ It may well be true that because it is common knowledge that most commercial corporations, including public utilities, insure their potential liability for assessed damages, it would indeed be a rare jury whose members were oblivious of the fact. But this argument begs the question: What would the verdict have been had there been no insurance, with that fact being made known to the jury? The affidavits indicate that the verdict would have been in favor of the defendants; if so, the taint of extraneous matter would require a new trial. Pursuant to Rule 606(b) a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention without doing violence to the importance of the inviolate nature of their deliberations because litigants are absolutely entitled to verdicts free of extraneous prejudicial information.

The fact of insurance was, as we have stated, briefly referenced by its expert, Geiger, who conducted a video-taped laboratory experiment to "demonstrate that wood can conduct electricity". We do not reach the issue involving the experiment; we mention it only to identify the witness who rather adroitly injected insurance into the case. As the trial judge stated, "Well, it's out"—the brief reference to insurance was probably more effective than a discourse on it. There is no escape from the conclusion that the verdict, as already noted, was essentially and blatantly based on insurance coverage. Under these circumstances the verdict cannot and ought not to stand.

The appellee argues that the issue of jury misconduct is raised for the first time on appeal because the appellant failed to "specifically set forth this ground in its motion for a new trial". This point is well taken. Nowhere in its motion does the

appellant properly allege juror misconduct. The allegation that the jury's verdict was based on passion, sympathy, prejudice and caprice, is obviously insufficient. The issue of jury misconduct involving matters other than insurance appears to be a serious one, but we are foreclosed by the failure of the appellant to state the grounds in its motion. Rule 3(e), *Rules of Appellate Procedure.*

The judgment is reversed and the case is remanded for a new trial. Costs are assessed to the appellee.

GODDARD, J., concurs.

FRANKS, J., dissents.

FRANKS, Judge, dissenting.

I disagree with giving any consideration to the jurors' affidavits. Essentially, all of the matters alluded to in the affidavits should be excluded pursuant to Rule 606(b), Tennessee Rules of Evidence. The majority, by considering these affidavits, is allowing the jury to impeach its verdict, prohibited by a long followed, familiar rule requiring no citations.

More important, I cannot agree with the majority's analysis which confuses two separate and distinct bases of error. It is reversible error to willfully interject into the record by way of evidence or argument the matter of liability insurance, *see Lovin v. Stanley*, 493 S.W.2d 725 (Tenn.App.1973) and cases cited therein, but the majority neither finds this basis nor reverses on this ground.

Prior to the adoption of Rule 606(b), a line of cases held that where "improper conduct" was otherwise shown, affidavits of jurors could then be used to demonstrate consideration of insurance influenced their verdict. *Littrell v. Smith*, 203 Tenn. 282, 311 S.W.2d 204 (1958); *Marshall v. North Branch Transfer Co.*, 166 Tenn. 96, 59 S.W.2d 520 (1933). *Cf. Wolfe et al. v. Vaughn*, 177 Tenn. 678, 152 S.W.2d 631 (1941) (holding that a casual mention of insurance by the jury during deliberations was not sufficient misconduct to set aside the jury verdict.)

The inconsistency of the majority's opinion is demonstrated by the holding that "the jury verdict ... was essentially and blatantly based on insurance coverage," which, without question, would be misconduct under cases cited *supra*, but the majority then holds "the issue of jury misconduct is raised for the first time on appeal" and "we are foreclosed by the failure of the appellant to state the ground in its motion for a new trial."

How the majority sets apart the misconduct of the jury involving matters of insurance from any other misconduct is not clear and I find no basis in the case law to support the majority's analysis and conclusions. In other words, the majority refuses to reverse on the basis of the mention of insurance by a witness before the jury [1] but makes a quantum leap from this refusal to the issue of jury misconduct raised by affidavits improperly considered to reverse, all the while eschewing the issue of jury misconduct as an issue properly on appeal.

---

**1.** This issue was not properly raised in the motion for a new trial either.