# IN THE COURT OF APPEALS OF TENNESSEE,
## AT JACKSON

FILED

**March 17, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

|  |  |  |
|---|---|---|
| **LYNN H. HARRIS and** | ) | Shelby County Circuit Court |
| **RHONDA W. HARRIS**, | ) | No. 47556-9 T.D. |
|  | ) |  |
| Plaintiffs/Appellants. | ) |  |
|  | ) |  |
| VS. | ) | C.A. No. 02A01-9803-CV-00074 |
|  | ) |  |
| **SUSAN GAIL THURMOND, M.D.**, | ) |  |
| **and NEUROLOGICAL AND** | ) |  |
| **NEUROSURGICAL CLINIC, P.A.**, | ) |  |
|  | ) |  |
| Defendants/Appellees. | ) |  |
|  | ) |  |

From the Circuit Court of Shelby County at Memphis.
**Honorable Jon Kerry Blackwood, Judge by designation**

**Douglas A. McTyier**,
WILSON, McRAE, IVY, McTYIER and STRAIN, Memphis, Tennessee
Attorney for Plaintiffs/Appellants.

**John J. Thomason**,
**Elizabeth T. Collins**,
THOMASON, HENDRIX, HARVEY, JOHNSON & MITCHELL, Memphis, Tennessee
Attorneys for Defendants/Appellees.

OPINION FILED:

**AFFIRMED AND REMANDED**

**FARMER, J.**

**HIGHERS, J.**: (Concurs)
**HAYES, J.**: (Concurs)

In this medical malpractice action, the jury returned a verdict in favor of the Defendants. The Plaintiffs filed a motion for new trial, which was denied by the trial judge. For the reasons set forth below, we uphold the jury verdict and affirm the trial judge's denial of the Plaintiffs' motion for new trial.

On March 4, 1988, Lynn H. Harris went to see Dr. Susan Gail Thurmond, a neurologist, complaining of various symptoms including changes in body temperature, changes in breathing rate, a feeling of lack of oxygen, breaks in concentration, dry mouth, dry throat, tingling throat, a flushed appearance, splotches on his face, and crossing of his eyes. Mr. Harris explained that he had been having what he described as fifteen to twenty second "spells" for approximately one and one-half years and that, on the days immediately preceding Mr. Harris' appointment with Dr. Thurmond, the "spells" had been occurring approximately twice per day. After obtaining his medical history, Dr. Thurmond examined Mr. Harris. Although the results of this examination were normal, Dr. Thurmond recommended that Mr. Harris obtain an electroencephalogram (EEG). Dr. Thurmond explained that if the results of the EEG were abnormal, she would then recommend that Mr. Harris obtain a magnetic resonance imaging test (MRI). Mr. Harris subsequently obtained two EEGs, a regular EEG and a sleep-deprived EEG. While the results of the regular EEG were normal, the results of the sleep-deprived EEG were "mildly abnormal" or "borderline." After reviewing these results, Dr. Thurmond did not order an MRI but instead gave Mr. Harris a prescription for Tegretol, an anti-convulsant medication. According to Dr. Thurmond, if Mr. Harris did not have any "spells" while taking Tegretol, this would indicate that the "spells" were seizure-related.

Mr. Harris saw Dr. Thurmond again on April 21, 1988. During this visit, Mr. Harris reported that he had not had any further "spells" and that he seemed to have more energy. Dr. Thurmond performed another examination of Mr. Harris. Again, the results of this examination were normal.

On July 19, 1988, Mr. Harris telephoned Dr. Thurmond's office, complaining of intermittent drowsiness and short term memory loss. Dr. Thurmond reduced the dosage on the medication that Mr. Harris was taking and scheduled an appointment for Mr. Harris on July 25, 1988. During this appointment, Dr. Thurmond conducted another examination of Mr. Harris, again

receiving normal results. Dr. Thurmond then altered Mr. Harris' medication, prescribing a different anti-convulsant drug named Depakote.

Mr. Harris visited with Dr. Thurmond again on June 13, 1989. During this appointment, Mr. Harris reported that he had not had any further "spells" and that he had not been taking his medication consistently. Dr. Thurmond concluded that, because Mr. Harris' "spells" had ceased even though Mr. Harris had not been taking his medication regularly, the "spells" probably were not seizure-related. Dr. Thurmond ordered a second sleep-deprived EEG, the results of which were normal.

Mr. Harris' final visit with Dr. Thurmond occurred on January 8, 1990. As of this final visit, Dr. Thurmond still had not made any specific diagnosis with respect to Mr. Harris' condition.

In May of 1991, an incident occurred during which Mr. Harris' body began to shake, his legs were rigid, and his speech was slurred. The "spells" that Mr. Harris had described to Dr. Thurmond began to reoccur. Additionally, Mr. Harris began to experience increasing amount of trembling of his hands. Consequently, on July 24, 1991, Mr. Harris went to see Dr. Lee Stein. At the suggestion of Dr. Stein, Mr. Harris underwent an MRI. The MRI report indicated that Mr. Harris had a large tumor in his brain. Dr. Stein referred Mr. Harris to Dr. John Crockarell, a neurosurgeon, who explained the results of the MRI to Mr. Harris. Dr. Crockarell then referred Mr. Harris to Dr. Winston Craig Clark, also a neurosurgeon. Dr. Clark performed surgery on Mr. Harris, removing as much of the tumor as possible. Subsequent to this initial surgery, Mr. Harris has undergone radiation therapy, chemotherapy, and a second surgery. After this second surgery in January of 1995, Mr. Harris developed paralysis on the left side of his body.

On July 23, 1992, Mr. Harris and his wife Rhonda W. Harris[1] filed a medical malpractice action against Dr. Thurmond and the Neurological & Neurosurgical Clinic, a professional association of physicians of which Dr. Thurmond was a member during the period of

---

[1]Mrs. Harris sought damages for loss of consortium.

time that Mr. Harris was under her care.[2]  In their answer, the Defendants raised the doctrine of comparative fault as an affirmative defense.  The matter came to be heard by a jury from August 18, 1997 to August 21, 1997.  The jury returned a verdict in favor of the Defendants.  The Plaintiffs filed a motion for new trial, which was denied by the trial judge.  This appeal followed.

Under the Tennessee Rules of Appellate Procedure, "[f]indings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict."  T.R.A.P. 13(d).  *See also Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 823 (Tenn. 1994); *Forrester v. Stockstill*, 869 S.W.2d 328, 329-30 (Tenn. 1994);  *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 898 (Tenn. 1992).  In returning a verdict in favor of the Defendants, the jury implicitly found that the conduct of Dr. Thurmond did not fall below the applicable standard of care and that, consequently, Dr. Thurmond did not breach a duty owed to Mr. Harris.  The Plaintiffs argue on appeal that there is no material evidence in the record to support this finding.

The Defendants offered the testimony of two expert witnesses, Dr. Thurmond and Dr. James Rodney Feild, a neurosurgeon.  With respect to whether her conduct fell below the standard of care, Dr. Thurmond testified as follows:

Q.  Under those circumstances, even if he had demonstrated a tumor, would conservative care have been a reasonable option for him?

A.  It would have been a reasonable option.

Q.  And is that what you gave him, conservative care?

A.  He had conservative care, yes.

Q.  Is that in conformance with the standard of neurological practice in Memphis, Tennessee during that time?

A.  Yes.

. . . .

Q.  Not knowing the cause of his symptoms, was the medication that you administered to him, did that appear to be a successful course of treatment for him?

---

[2]The Neurological & Neurosurgical Clinic is now known as the Canale Group.  Dr. Thurmond's association with this entity ended in November of 1989.

A.    Well, I don't know if that was a successful course or if the spells went away on their own, as I said, because he took the medicine somewhat erratically.

Q.    Do you think that was a course of treatment that was in accordance with the neurological standard of care expected of you during that time when you were treating Mr. Harris?

A.    Yes.

. . . .

Q.    And did you -- Dr. Thurmond, are you acquainted during this period of time with the standard of care for neurologists in Memphis?

A.    Yes, sir.

Q.    And did you conform to that standard?

A.    Yes, sir.

Additionally, Dr. Feild testified as follows:

Q.    Are you familiar with the standard of care of neurosurgery and neurology in Memphis?

A.    I am.

Q.    And were you in 1988 through the present?

A.    Correct.

. . . .

Q.    From your reading of the records, was Dr. Thurmond's first office visit when she saw Mr. Harris within the standard of care?

A.    It was.

. . . .

Q.    From your reading of Dr. Thurmond's record, what treatment did Dr. Thurmond give around the time of that June 1989 visit?

A.    Well, I assume -- I don't have the record. I didn't follow that. But I assume that he was encouraged to take his medicine and that his blood level was pushed up a little bit. The significant part of that visit is another sleep deprived EEG was ordered, and that was the third EEG in a year, and it was normal. That's pretty heavy stuff, to have these spells and not take your medicine and have the EEG a year later normal.

Q. Is that significant?

A. Right.

Q. And when you said heavy stuff, what does that mean?

A. Well, it means the -- there's no activity, no seizures, no spells, nothing going on. There's no trace of anything going on. She was relying on the technology, and it hadn't picked up any disorder, hadn't picked up any seizures and hadn't picked up any slowing or anything else.

Q. Was Dr. Thurmond's treatment at that visit within the appropriate standard of care for neurologist in Memphis, Tennessee?

A. Yes.

The opposite conclusion was reached by Dr. Clark and Dr. Sheldon Margulies, who testified as expert witnesses for the Plaintiffs. Dr. Clark and Dr. Margulies both testified that, in failing to order an MRI or a CT scan, Dr. Thurmond's conduct fell below the applicable standard of care. Dr. Margulies is a neurologist and Dr. Clark's specialty is neurological surgery.

It is well settled that the trier of fact is in the best position to judge the credibility and weight of testimony offered by expert witnesses. *See, e.g., State ex rel. Comm'r, Dep't of Transp. v. Teasley*, 913 S.W.2d 175, 179 (Tenn. App. 1995). Thus, on appeal from a jury verdict, we are not permitted to reweigh evidence or reevaluate the credibility of expert witnesses. *See, e.g., Witter v. Nesbit*, 878 S.W.2d 116, 121 (Tenn. App. 1993)(citing *Grissom v. Metro. Gov't*, 817 S.W.2d 679, 684 (Tenn. App. 1991)). Rather, our inquiry is limited to determining whether there is any material evidence in the record to support the jury's verdict. *See Reynolds*, 887 S.W.2d at 823. If there is any material evidence to support the jury's verdict, it will not be disturbed on appeal. *See Reynolds*, 887 S.W.2d at 823; *Forrester*, 869 S.W.2d at 329-30; *Hodges*, 833 S.W.2d at 898; T.R.A.P. 13(d).

In the instant case, the aforementioned testimony of Dr. Thurmond and Dr. Feild is material evidence that supports the jury's verdict. Thus, under the very deferential standard of review that applies to findings of fact made by a jury, we must uphold the jury's implicit finding that Dr. Thurmond did not breach a duty of care owed to Mr. Harris.

The Plaintiffs next argue that the jury verdict should be reversed because it was the result of juror misconduct. In support of this argument, the Plaintiffs offer the affidavits of Cammie Thomas, III and Eugenia R. Straub, two members of the jury in the case at bar. These affidavits indicate that the majority of the jurors believed that there was fault on the part of Dr. Thurmond. The affidavits of Ms. Thomas and Ms. Straub further indicate, however, that the jurors agreed that Mr. Harris should have done more for himself. Specifically, the jurors thought that Mr. Harris should have been more aggressive in his own medical care, that Mr. Harris should have obtained a second opinion, and that Mr. Harris should have taken his medication more regularly.

Under the Tennessee Rules of Evidence, we are not permitted to consider the statements of a juror unless they relate to the question of "whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict." T.R.E. 606(b). *See also Goss v. Hutchins*, 751 S.W.2d 821, 828 (Tenn. 1988); *State v. Blackwell*, 664 S.W.2d 686, 688 (Tenn. 1984); *Terry v. Plateau Elec. Coop.*, 825 S.W.2d 418, 423 (Tenn. App. 1991). In the instant case, the Plaintiffs do not allege that the jury verdict was tainted by extraneous prejudicial information or outside influence. Nor do the Plaintiffs allege that the jurors agreed to be bound by a quotient or gambling verdict. Thus, we are not permitted to consider the aforementioned affidavits when determining whether the trial judge erred in denying the Plaintiffs' motion for new trial. Because the Plaintiffs have offered no admissible evidence suggestive of juror misconduct, we find no error on the part of the trial judge with respect to this issue.

Finally, the Plaintiffs argue that the trial judge should have granted their motion for new trial because the jury verdict was affected by improper statements made by counsel for the Defendants. During closing arguments, counsel for the Defendants stated as follows:

> So this lawsuit of which coming back with a verdict for the plaintiff is saying Dr. Thurmond, you were guilty. You were guilty of medical negligence. You were guilty of medical malpractice. So that is what a verdict for the plaintiff does. It puts that badge on Dr. Thurmond. So it is as significant to Dr. Thurmond. This case is every bit as important to her life and her profession.

These comments raised an objection from counsel for the Plaintiffs, which was overruled by the trial judge.

In general, trial judges are afforded a great deal of discretion regarding the types of comments that are permissible during argument of counsel. *See Davis v. Hall*, 920 S.W.2d 213, 217 (Tenn. App. 1995). When a trial judge refuses to grant a new trial based on the misconduct of an attorney, we may not interfere with this action unless the attorney's argument was "clearly unwarranted and made purely for the purpose of appealing to passion, prejudices and sentiment which cannot be removed by sustaining the objection of opposing counsel." *Id.* (citing *Perkins v. Sadler*, 826 S.W.2d 439, 442 (Tenn. App. 1991)). Consistent with this rule, decisions of trial judges with respect to the conduct of attorneys in open court are examined using the abuse of discretion standard of review. *See In re Ellis*, 822 S.W.2d 602, 605 (Tenn. App. 1991)(citations omitted). In the instant case, we do not think that the statements made by counsel for the Defendants were clearly unwarranted or made purely for the purpose of appealing to passion, prejudices, and sentiment. Rather, it appears that these comments were made in order to emphasize to the jury that the outcome of the lawsuit was just as important to the Defendants as it was to the Plaintiffs. We cannot say that this purpose is in any way inappropriate. Thus, we find no abuse of discretion on the part of the trial judge in refusing to grant a new trial based on the comments made by counsel for the Defendants during closing arguments.

Based on the foregoing, we uphold the jury's verdict in the instant case. Additionally, we affirm the trial judge's denial of the Plaintiffs' motion for new trial. Costs on appeal are charged to the Plaintiffs, for which execution may issue if necessary.

_____
FARMER, J.

_____
HIGHERS, J. (Concurs)

_____
HAYES, J. (Concurs)