# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
October 14, 1999 Session

## PAULL ANDERSON v. EDWARD MEZVINSKY

**Appeal from the Circuit Court for Washington County**
**No. 17452    G. Richard Johnson, Chancellor**

**FILED AUGUST 28, 2001**

**No. E1998-00795-COA-R3-CV**

---

Paull Anderson sues Edward Mezvinsky, seeking damages for breach of the contract to pay Mr. Anderson certain fees in connection with solicitation of donations to the Foundation for Advancement, Education and Employment of American Indians.  The jury found in favor of Mr. Mezvinsky.  Mr. Anderson appeals, raising the issues set out in our opinion.  We find the issues raised on appeal to be without merit and affirm the judgment entered.

**Tenn.R.App.P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Cause Remanded**

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and D. MICHAEL SWINEY, JJ., joined.

Paull Anderson, Morriswotn, Tennessee, Appellant, *Pro Se*

Frank A. Johnstone, Kingsport, Tennessee, and W. Gordon Ball, Knoxville, Tennessee, for the Appellee, Edward Mezvinsky

## OPINION

This case was originally heard on oral argument on October 14, 1999.  Thereafter, Edward Mezvinsky filed a petition seeking protection of the Bankruptcy Court.  An automatic stay was issued which was lifted by order entered on June 6, 2000, after which, by order entered on September 5, 2000, the case was transferred to the active docket of this Court.

We first deal with a motion filed by Mr. Anderson asking that we consider post-judgment facts pursuant to Tenn.R.App.P. 14.  We deny the motion because the facts sought to be considered do not meet the criteria of Rule 14.

## The Pleadings

The plaintiff alleges that he entered into a contract (the "Finder's Fee Agreement") with an entity called the Foundation, and that the defendant signed the Agreement as "chairman" of the Foundation. The Finder's Fee Agreement provided that the plaintiff would receive a fee for any donations he originated for the Foundation. The plaintiff alleged that he originated donations to the Foundation, specifically a donation of nursery stock of the Riverview Nursery, a tree farm at Limestone, Tennessee, valued at $2,837,088, and a Bristol industrial plant (the Unisys plant) of the value of $6,000,000. The plaintiff claimed to be entitled to $883,708.80 for his services under the terms of the Finder's Fee Agreement.

The plaintiff further alleged that the Foundation entered into a separate contract (the "Brokerage Agreement") to pay him a brokerage commission for sales of the nursery stock. The Brokerage Agreement was also signed by the defendant on behalf of the Foundation. The plaintiff alleged that although he arranged a sale of the nursery stock by the Foundation for $2,250,000.00 (the "Nursery Stock Sales Contract"), the Foundation refused to pay him. The plaintiff also claims to be entitled to $225,000 for his services under the Brokerage Agreement.

The plaintiff alleged that the Finder's Fee Agreement, the Brokerage Agreement and the Nursery Stock Sales Contract were all negotiated and executed by defendant Mezvinsky and H. Nicholas Johnson, who was represented to be president of the Foundation, and that he performed services in reliance upon the representations and promises in those agreements.

More specifically, the plaintiff alleged that the defendant and Johnson induced him to sign the agreements with no intention to perform them, and that the defendant misrepresented his authority with the Foundation. He alleged that the defendant's promises of performance "were intentionally and deliberately made with the present intention not to compensate the plaintiff for the services he performed pursuant to said contracts" or in the alternative, "the defendant . . . deliberately and intentionally misrepresented his capacity with the Foundation" because he was not the "chairman" of the Foundation and " . . . acted in his individual capacity . . ." He further alleged that the defendant's promises of performance and his representations as to his relationship with the Foundation were intentionally and deliberately made for the purpose of deceiving him, or, in the alternative, the promises of performance under the contracts and his representations as to his relationship with the Foundation were recklessly and negligently made without regard for their truth or falsity.

In Count II the plaintiff alleges that the Foundation intended to perform the agreements, but claims that defendant and Johnson "deliberately and intentionally" conspired to breach them, and that the defendant and Johnson "acted in concert to obtain property and money by false and fraudulent pretenses, representations and promises."

In Count III, the plaintiff alleges that the "[d]efendant is not in fact an agent for the Foundation and . . . acted in his individual capacity . . .," and that he breached the contracts.[1]

In Count IV, the plaintiff alleges that the defendant violated the provisions of the Racketeering and Corrupt Organizations Act, 18 U.S.C. sec. 1961, *et seq.*

The defendant changed lawyers three times during this litigation, and each filed responsive pleadings. It may be broadly stated that the defendant denied RICO activity, while accusing the plaintiff of RICO activity, and denied personal liability because the plaintiff's contracts were with the Foundation.[2]

These are the Statements of the Issues as propounded by the plaintiff *in haec verba:*

1.      Whether the charge was prejudicial and misled the jury regarding the agency and ratification issues, improperly told the jury what to find concerning a crucial issue of material fact, failed to comply with case law authority re In Pari Delicto defense, failed to include defendant's burden and level of proof, was inconsistent with the undisputed evidence, and was given in an improper manner that blindsided the plaintiff?

2.      Whether the post trial actions of the trial judge were most unreasonable reflecting abuse of discretion in denying the plaintiff opportunity to submit an effective motion for a new trial, aborting plaintiff's Rule 18 and Rule 60 motions and right of appeal, and discriminating against plaintiff's right to due process, equal justice and right of appeal?

3.      Whether the loss of plaintiff's evidence, and failure by the trial judge to submit that evidence before the jury, by the trial judge denied plaintiff a fair trial?

4.      Whether the trial judge violated, and allowed defendant to violate, his own order and Local Rule 5.01?

---

[1] This allegation, together with the evidence adduced in support of it, is wholly contrary to the allegations of a Federal Court complaint and related documents. There, the defendant is alleged to have acted on behalf of the Foundation.

[2] The plaintiff recovered a judgment in the U.S. District Court, Abingdon, Va. against the Foundation and Johnson. The defendant was dismissed from the action for lack of personal jurisdiction. The case was not heard on the merits; a default was entered on punitive grounds, which was affirmed by the 4th Circuit Court of Appeals in August, 1999. Its *per curiam* opinion is reproduced here for informational purposes, as Appendix A.

5.   Whether the trial judge erred in reversing his earlier ruling and dismissing plaintiff's 1962(a) RICO claim?

6.   Whether the trial judge erred in reversing his prior Rule 56 ruling and dismissing plaintiff's claim to a fee concerning the donation of the Unisys property?

7.   Whether the trial judge erred in denying testimonial evidence from plaintiff's witness Perry re material issues of fact?

8.   Whether the trial judge erred by allowing defendant to introduce and pursue evidence, earlier ruled inadmissible, concerning alleged prejudicial statements by plaintiff's counsel?

9.   Whether the trial judge erred in denying the admission of evidence of party admissions and documentary evidence reflecting upon the defendant's credibility?

10.  Whether error by the trial judge denied plaintiff opportunity to develop issues on appeal from the Rule 51 conference and jury instruction draft?

11.  Whether the trial judge erred and/or abused his discretion in abandoning jury control which resulted in the jury's failure of its legal duty?

12.  Whether the trial judge erred and/or abused his discretion in failing to properly act upon plaintiff's motion for a new trial, to independently reweigh all of the evidence and then determine whether it preponderated in favor of or against the verdict?

### Standard of Review

Finding of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict. Rule 13(d), T.R.A.P. We are required to take the strongest legitimate view of the evidence favoring the prevailing party, discard all contrary evidence, allow all reasonable inferences to uphold the verdict and set aside the verdict only when there is no material evidence to support it. *Witter vs. Nesbit*, 878 S.W.2d 116 (Tenn. Ct. App. 1993); *Scott vs. Jones Bros. Const.*

*Co.,* 960 S.W.2d 589 (Tenn. Ct. App. 1997); *Hodges vs. S. C. Toof & Co.*, 833 S.W.2d 896 (Tenn. 1992).

In reviewing a jury verdict it is not the prerogative of this court to decide what weight is to be given testimony. That decision is exclusively for the jury. Whether the court agrees with the jury's determination of an issue of fact is immaterial. If rational evidence is present on either side of a fact issue an appellate court is bound by the jury's determination of such fact, *Phillips vs. Pitts*, 602 S. W. 2d 246 (Tenn. Ct. App. 1980), and the credibility of any party or witness is within the prerogative of the jury. This court is not at liberty to reweigh the testimony. *Pullen vs. Textron, Inc.*, 845 S.W.2d 777 (Tenn. Ct. App. 1992).

## I

This issue generally assails the charge as misleading the jury with respect to (1) the agency of the defendant, and (2) by instructing the jury that even if the jury found that the defendant misrepresented his agency, he would not be liable if it found that the Foundation accepted the benefits of the contract. The remaining sub-issues are in the main verbal denunciations.

The defendant responds that alleged errors in the charge were not alleged as grounds for a new trial, and are thus beyond appellate reach, since in "all jury cases, the specific issue must be included in the motion for a new trial." Rule 3(e), T.R.A.P.; *Terry vs. Plateau Elec. Co-op.*, 825 S.W.2d 418 (Tenn. Ct. App. 1991).

The grounds asserted in the motion for a new trial [see, Appendix B] are non-conforming but upon consideration of the unusual posture and circumstances of this case we conclude that neither procedural nor substantive rules will suffer if we address the thrust of the plaintiff's argument. To accomplish this, an overview of the predicative facts will be helpful.

The plaintiff says that he is entitled to two distinct finder's fees for two donations he originated: (1) the Riverview Nursery Plants donated by his client, Dr. Walter Harber, in September 1992 with an "agreed value" of $2,837,088.80, and the Unisys property donated by Sam Grigsby in January 1994 with an "agreed value" of $6,000,000.00. The second brokerage agreement, dated March 1992, provided the plaintiff was to receive 10% of the sales price of the aforementioned nursery stock to American Nursery Products for $2,250,000.00.[3]

The various defenses asserted by the defendant included the rule that he was acting as agent for a disclosed principal and, as such, was not liable for the principal's nonperformance. He conceded that an agent can be liable if he contracts in a manner contrary to his instructions and

---

[3] An earlier trial resulted in a mistrial when Johnson, purported Chairman of the Foundation, was found in contempt for jury tampering. At the first trial, Mezvinsky's testimony tended to support the legitimacy of the Foundation, and thus stood in stark contrast to his testimony at the second trial when he denounced the Foundation as a scam and accused Anderson as being *in pari delicto:* ("Mr. Anderson knew more about the Foundation than I ever cared or want to know.")

authority, but only if his principal refuses to ratify the contract. He also asserted that the plaintiff was *in pari delicto* with the Foundation, apparently in response to the plaintiff's insistence that the defendant misrepresented his authority in furtherance of an unlawful scheme - RICO - to defraud the plaintiff of his fees and commission.

At this juncture we note the convoluted nature of the evidence in this case which apparently repulsed the jury. Keeping in mind that the Federal Court action resulted in a judgment for the plaintiff against the Foundation, the plaintiff was clearly hard pressed to maintain his insistence, in the state court, that the defendant was also liable to him because he did not reveal his principal - the Foundation - or because he agreed to be personally bound.

On January 23, 1992, the defendant[4] sent the plaintiff the following letter:

"The Foundation for Advancement, Education and Employment of American Indians was authorized to commence business on December 15, 1976, by the Internal Revenue Service and the Department of the U. S. Treasury as an organization described as a 501 (c)(3), with an employer identification number 510204431. Both are still in effect.

The Foundation hereby agrees to pay you and/or your designees a finder's fee of ten (10%) percent of the agreed value of any contribution that you cause the Foundation to receive under Article VI, section 1 of the Foundation's Articles of Incorporation."

On October 2, 1992, Johnson sent the following letter to the plaintiff:

"Enclosed you will find the following:

1. Walter Harber and David Holtsclaw contract.

2. Copy of the Foundations Articles of Incorporation.

3. Information package of our Foundation.

This is to further assure you that you will receive your 10% finders fee on the Harber project, also 10% fee for selling the timber.

Further you will receive 10% on any donation to our group that you originate."

On March 23, 1992, the Foundation and the plaintiff entered into the following contract:

---

[4]Who is a Pennsylvania lawyer and former Congressman.

"This contract made and entered into this 23rd day of March, 1992, by and between the Foundation for Advancement, Education and Employment of American Indians, Party of the First Part, and Paull Anderson, 2757 Kings Mill Pike, Bristol, Virginia, 24201, Party of the Second Part.

WITNESSETH: That in consideration of the covenants and agreements hereinafter contained on the part of said Party of the Second Part, the said Party of the First Part does agree as follows:

The First Party has acquired the nursery stock located on the Riverview Nursery in Limestone, Tennessee, with an estimated value of $2,837,088.00.

The First Party hereby gives, to the Second Party an exclusive sales contract of ten percent (10%) commission of the monies produced by the harvesting and sales of this inventory.

If the First Party should sell, devise or otherwise transfer the title to the premises such transfer shall be subject to the provisions of this contract.

IN WITNESS WHEREOF the above named parties have hereunto set their hands on the day above written and for themselves, their heirs, administrators and assigns, and hereby agree to do the full performance of the covenants and agreements as hereinabove set forth."

In light of the plain language of these instruments it is not surprising that the Federal Court entered judgment against the Foundation, keeping in mind, as it were, that the entire factual scenario was not presented, as we have seen.

There is material evidence from which the jury could have found the following facts from the evidence presented:

Plaintiff is a self described farmer, businessman and a business consultant. He is not a licensed real estate broker.

In September or October 1990, plaintiff met Nicholas Johnson, who identified himself as the president of the Foundation, a charity approved by the Internal Revenue Service. Johnson told the plaintiff that the Foundation would pay a fee to anyone who originated a donation.

The plaintiff managed a nursery in Virginia for Paul Cipro. He, with Johnson, attempted to arrange a donation from Cipro to the Foundation. He also tried to interest Larry Dishner, a Kingsport real estate agent, in the nursery. The contribution of the Virginia nursery to the Foundation was never completed, and

according to the plaintiff, the deal collapsed sometime in February or March 1991. At the plaintiff's urging, Dishner, who had no experience in nursery management, formed Green Valley Farms to buy the nursery from Anderson's client.

Walter Harber, a Johnson City orthodontist, and David Holtsclaw operated the Riverview Nursery in Limestone, Tennessee. Harber owned the real estate. He and Holtsclaw owned the nursery stock. Harber and Holtsclaw wanted to sell the nursery, including the real estate, for a price of $750,000.

Sometime in 1991, the plaintiff recommended that Harber contribute the nursery to the Foundation for certain tax benefits. On January 20, 1992, Harber contributed the plants to the Foundation, although he was unaware that Anderson had an arrangement with Johnson and the Foundation to receive a fee for the contribution.

The defendant, at Johnson's request, sent the letter on his professional stationery to Anderson on January 23, 1992, which we have reproduced.

The plaintiff told Dishner that the Internal Revenue Service required appraisals for contributions of property to charitable organizations. Representatives of the Virginia Extension Service valued the nursery stock for $900,000. The plaintiff prepared an appraisal, purportedly based on the Virginia Extension Service review, which valued the nursery stock at $2,837,088 and sent it to Dishner, who admitted he was not a qualified appraiser, but nevertheless copied the appraisal on the letterhead of Green Valley Farms. Dishner then sent the appraisal to the plaintiff, who, in turn sent it to Harber, who paid Dishner for the appraisal. Dishner believed that the values were based on the judgment of the Virginia Extension Service. Dishner signed IRS Form 8283 for Harber which reported the value of donated property to the Internal Revenue Service as $2.8 Million based on the appraisal prepared by Anderson and signed by Dishner. Harber was not aware of the fact that Anderson had written the appraisal for Dishner.

On March 23, 1992, the plaintiff and the defendant, on behalf of the Foundation, signed an agreement giving Anderson another fee if he *sold* the nursery stock for the Foundation. The agreement provided in part, as we have seen, that

The First Party [the Foundation] hereby gives the Second Party [Anderson] an exclusive sales contract of ten percent (10%) commission of the monies produced by the harvesting and sales of the inventory.

By letter dated March 31, 1992, the defendant on behalf of the Foundation, acknowledged receipt of Harber's contribution. He also signed a Form 8283 on behalf of the Foundation acknowledging receipt of the nursery plants.

Holtsclaw objected to the contribution of the trees to the Foundation. The dispute was resolved and the contribution completed in September 1992. The Foundation agreed to pay Holtsclaw for his interest in the nursery. On October 2, 1992, Johnson sent a letter to the plaintiff confirming their earlier agreement.

The plaintiff then purported to sell the trees for the Foundation. According to his testimony, he arranged for the trees to be brokered through a longtime acquaintance, Judson DeCell. Johnson, for the Foundation, and DeCell signed an agreement dated December 10, 1992. Although the agreement recites that DeCell made a down payment of $100,000, no money changed hands. The plaintiff used a part of his claimed commission as the down payment, and described himself as the primary broker of the nursery stock and DeCell as the secondary broker.

The DeCell contract was not completed. The Foundation sold the trees to a third party, Ben Frizzell, for $550,000 with Harber ultimately receiving a tax deduction of $400,000. The plaintiff claims total *fees* in excess of $500,000 for the nursery which was sold for $550,000.

The plaintiff also claims a $600,000 fee on the transfer of the Unisys plant in Bristol to the Foundation despite evidence of all principals to the transfer that he played no part in the transfer. This claim was dismissed prior to trial.

The jury could have found that the plaintiff attempted to recover a fee based on his inflated appraisal which he attempted to pass off as the work of another, and rejected his claims.

The plaintiff complains of this portion of the charge as being inconsistent with the evidence:

"We also had an issue of agency arise, and I'm going to now charge you on this contract theory, the Law of Agency that applies to this case. The defendant alleges he was an agent of his principal, the Indian Foundation. The defendant contends that he acted within his scope of authority as agent of the Indian Foundation.

In this case the defendant claims he was acting at all relevant times as an agent of the Indian Foundation."

This statement by the Judge was merely a recitation of the respective theories.

## II

The jury was instructed that:

> "intentional misrepresentation in RICO involves deception, and if one knows the truth or is involved in the deception, he is not defrauded. The intentional misrepresentation brought by the plaintiff involves fraud and deception. If you find that the plaintiff was involved in the fraud and deception, he cannot recover from the defendant under any circumstance."

The jury heard evidence that the plaintiff *tripled* the value initially assigned to the Nursery stock by the Virginia Extension Service. These inflated values were forwarded to the real estate broker, who adopted them as his own for appraisal purposes. The jury could reasonably have found that the appraisal was the handiwork of the plaintiff. If so, an element of fraud appeared.

The plaintiff was the prime instigator of these activities. He persuaded the owner of the nursery to give it to the Foundation; he negotiated the finder's fee; he prepared the inflated appraisal; he was *paid a fee by the owner.*

This record consists of hundreds of pages of testimony replete with accusations of fraudulent conduct by the plaintiff, by the Foundation, its Chairman Johnson, and by the defendant. Many of the accusations involved criminal conduct designed to cheat the United States Treasury. We see no reason to enlarge upon these mutual, splenetic accusations. Suffice to say that fraud vitiates all transactions and the court will not lend its aid in furtherance thereof.

The plaintiff says that the "mindset of the defendant is to try to beat and cheat anyone he can", and alleges specific instances of such conduct. He refers to the defendant's "shameful record" with some particularity, and to "his Foundation and crooked 'good friend' and convicted fraud felon H. N. Johnson." The defendant counterattacked with the *In Pari Delicto* defense.

## III

The plaintiff next insists that the court erroneously charged the jury that the defendant could not be held liable for misrepresenting his authority if it found that the Foundation had accepted the benefit of this contract. The plaintiff argues that ratification is not a defense where the agent was guilty of fraud and misrepresentation.

It is well settled that a contract with a known agent for a disclosed principal is the contract of the principal unless circumstances show that the agent intended to be bound or assume the contractual obligations. *Holt vs. American Progressive Life Insurance Co.*, 731 S.W.2d 923 (Tenn.Ct. App. 1987).

-10-

It was the prerogative of the jury to determine from all of the evidence whether the defendant had agreed to be personally bound, or whether he had committed such fraud as to render himself personally liable.

## IV

The plaintiff next argues that the charge "told the jury what to find concerning a crucial issue of material fact regarding the defendant's *in pari delicto* defense," pointing out that in his opening statement defense counsel characterized the plaintiff's claim *as fraudulently in concert with the Foundation* and the defendant, and stressing the point throughout the trial.

Counsel for the defendant dealt with this matter rather harshly, as was his prerogative. He argued that

> ". . . if you find, *as the Judge is going to tell you*, that Paull Anderson participated, knew about it, then obviously Paull Anderson should not benefit from something that wasn't there in the first place. . ." (Emphasis supplied.)

We agree with plaintiff that this argument was inappropriate. It is not permissible to predict to the jury what the trial judge will charge. *Zang v. Leonard*, 643 S.W.2d 657 (Tenn. Ct. App. 1982). The court charged:

> Intentional misrepresentation in RICO involves deception, and if one knows the truth or is involved in the deception, he is not defrauded. The intentional misrepresentation brought by the plaintiff involves fraud and deception. If you find that the plaintiff was involved in the fraud and deception, he cannot recover from the defendant under any circumstances.

There is nothing in the instruction to indicate "that Paull Anderson participated, knew about it . . ." The charge is a correct statement of the law, and in no way does it infringe upon the province of the jury. As it developed, the Judge did not charge as predicted by Counsel.

We have studied the charge in its entirety. It is thirty-five pages long and runs the gamut. We find nothing in it to justify a reversal of this case, including the argument that the court modified the charge without affording the parties an opportunity to review the modified version. In this connection, the plaintiff argues that the modification "the intentional misrepresentation brought by the plaintiff involves fraud and deception" was so subtle it went undetected and its effect was not considered until after his motion for a new trial was denied. The Rule 59 motion addressing this issue was not appropriate.

As heretofore noted, one of the plaintiff's theories of recovery was an allegation that the defendant engaged in RICO activities. The Chancellor's jury instructions included a comprehensive

exposition of RICO, but did not include a charge specifically directed to section 1962(a) of which the plaintiff complains.

The difficulty with this argument is to be found in the fact that the 1962(a) claim was dismissed on summary judgment, and hence was not before the jury.

The plaintiff complains that the *in pari delicto* defense was inapplicable, that it was asserted too broadly, that the Court erred in failing to charge the jury respecting the burden of proof, and that the Court erred in charging the jury that *in pari delicto* was a valid defense to a civil action alleging RICO violations. We will discuss these complaints of error generally.

First, the Chancellor did not allude to the *in pari delicto* defense except to the extent previously noted with respect to fraud and deception, a correct statement of the law. Secondly, the *in pari delicto* defense was not objected to. Thirdly, we do not find anywhere in the charge that the Chancellor instructed the jury as claimed by the plaintiff.

In any event any asserted errors in the instructions were clearly harmless in light of all the evidence in the case. *Childs vs. Roane County Bd. of Educ.*, 929 S.W.2d 364 (Tenn. Ct. App. 1996).

## V

The plaintiff next argues that "the post-trial actions of the trial judge were unreasonable, prejudicial and reflected abuse of discretion, violated the rules, laws, and constitution of Tennessee." The lack of specificity precludes consideration of this argument.

## VI

The plaintiff next argues that the "trial judge error resulted in the loss of the plaintiff's evidence which should have reached the jury." This issue was not raised in the motion for a new trial, and cannot be considered. Rule 3(a) T.R.A.P.

## VII

The plaintiff next argues that the court erred in dismissing his RICO claim, which alleges the defendant violated 28 U. S. C. § 1962:

§ 1962. Prohibited activities

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly any part of such income, or the proceeds of such income, in acquisition

of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

(b)    It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c)    It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d)   It shall be unlawful for any person to conspire to violate any of the provision of subsections (a), (b), or (c) of this section.

Whether a civil action for damages alleging RICO violations may be filed in a state court is not an issue.

The defendant insisted, and the trial court agreed, that the complaint failed to allege with particularity the requisite racketeering activity. The claim must be pleaded with the same particularity that is required in the pleading of fraud. *Taylor v. Bear Stearns & Co.*, 572 F. Supp. 667 (N. D. Ga. 1983). A generalized accusation of racketeering, or the perpetuation of fraud, is not sufficient; specificity must show that crimes were committed. *Bache Halsey Stuart Shields Inc. v. Tracy Collins Bank and Trust Co.*, 558 F. Supp. 1042 (D. Utah 1983). The thrust of the complaint alleges that the Foundation and Johnson maintain control of and operate the Foundation through a pattern of racketeering activity. This assertion is merely conclusory and falls far short of particularizing criminal conduct.

## VIII

The plaintiff next argues that the court erred in dismissing his action to recover a fee "concerning the donation of the Unisys property."

Simply stated, the Unisys property was purchased by Sam Grigsby in May 1993. He donated this property to the Foundation in January 1994, and the Foundation sold it to Exide Corp., on the same day. The plaintiff concedes that he had no role in the sale of the property; rather, he argues that his involvement was limited to "a singular distinct role concerning the Unisys property donation was to identify, 'originate,' the possible donor, Grigsby, to Johnson."

The trial judge dismissed this claim principally owing to the fact that the plaintiff was not a licensed agent or broker, and that T.C.A. § 62-13-105 precludes his recovery of a commission in the sale. See, *Business Brokerage Centre vs. Dixon*, 874 S.W.2d 1 (Tenn. 1994). The plaintiff argues that his finder's fee agreement is not within the ambit of T.C.A. § 62-13-105, and that he does not seek a commission on the *sale* of the Unisys property. He insists that he "originated" the donation of the property to the Foundation, and such act was within the scope of his contract. Hence, he argues that the jury should have been allowed to consider the issue.

The verdict settled the issue of the defendant's personal liability in this case. We find no evidence in this record which would fasten liability upon the defendant. The contracts upon which this litigation is based clearly indicate that it is the Foundation, and not the defendant, who is the contractor, and there the matter ends.

We have considered the remaining issues and conclude that for lack of specificity, or relevance, or non-inclusion in the motion for a new trial, none of them need be considered.

The judgment of the trial court is affirmed and the case is remanded for collection of costs below. Costs of appeal are adjudged against the plaintiff, Paull Anderson, and his sureties.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE