# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### July 20, 2004 Session

## ROSETTA WILLIS v. MIKE SETTLE, ET AL

**A Direct Appeal from the Circuit Court for Madison County**
**No. C-00-279    The Honorable Roger A. Page, Judge**

---

### No. W2004-00636-COA-R3-CV - Filed September 20, 2004

---

This is an appeal from a judgment entered on a jury verdict for Plaintiff/Appellee. Plaintiff/Appellee was taken hostage by a prisoner who escaped from the control and custody of Defendant/Appellant, a private corporation contracting with the State of Tennessee to provide prison security. Defendant/Appellant asserts that it is entitled to immunity under the Public Duty Doctrine, that there was no material evidence on which the jury could have based its verdict, that the award of compensatory damages was excessive and not supported by the evidence, that Defendant/Appellant cannot be held responsible for the actions of its employees under the doctrine of respondeat superior, and that the trial court erred in not granting a mistrial. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J. and HOLLY M. KIRBY, J., joined.

James I. Pentecost and William B. Mauldin of Jackson for Appellant, Corrections Corporation of America[1]

David W. Camp of Jackson for Appellee, Rosetta Willis

### OPINION

Corrections Corporation of America ("CCA," "Defendant" or "Appellant") is a private, for-profit corporation that contracts with the State of Tennessee to provide management of the State's correctional facilities. CCA operates numerous facilities, including the prison located in Whiteville, Hardeman County, Tennessee, known as the Hardeman County Correctional Facility ("HCCF"). On August 16, 1999, Officer Lee Vandiver ("Vandiver") and Officer Shannon Crowder ("Crowder") were Correctional Officers employed by CCA.

---

[1] Appellant's counsel was not trial counsel in this case.

Mike Settle ("Settle") is a medium security inmate, housed at HCCF.[2] On August 14, 1999, Settle was brought to the Jackson-Madison County General Hospital for an apparent drug overdose. On August 16, 1999, Vandiver and Crowder were assigned to provide security for Settle. That morning, Crowder left Settle's room to obtain a meal ticket for himself and Vandiver. After Crowder left the room, Settle informed Vandiver that he had to use the bathroom immediately. At that time, Settle was lying in bed with an I.V. in each arm and a catheter inserted. One of Settle's legs was locked in a leg iron and the other end of the leg iron was attached to the hospital bed. Vandiver was aware that Settle had been given tar and a laxative to help him pass the tar. Vandiver had also been told by hospital staff that it would be the responsibility of the Correctional Officers to get Settle up and to the bathroom when the laxative took effect. To that end, Vandiver unlocked the leg iron from the bed but did not reattach it to Settle's other leg. With the leg iron dangling from one leg, Settle got out of bed and started toward the bathroom with an I.V. pole in each hand and the catheter bag also in his left hand. As Settle approached the bathroom, he dropped the catheter bag and bent over to pick it up. He then rammed Vandiver and hit him in the groin with his fist. Settle grabbed Vandiver's weapon, threatened the officer with physical harm, grabbed a pair of tennis shoes and ran from the hospital room. Vandiver gave chase but stopped once Settled reached the doorway leading to the stairwell. Vandiver then returned to the nurses' station where he notified hospital security that Settle had escaped and also notified the Warden at HCCF. Settle removed the catheter bag and the leg iron,[3] and put on his shoes.

At the same time as the escape, Rosetta Willis ("Willis," "Plaintiff," or "Appellee") was in the payroll department of the hospital to make sure that her paycheck accurately reflected the overtime she had worked. Security cameras photographed Settle during his escape from the hospital. Still photographs were taken from the security camera videotape and admitted as Exhibit 8 during the trial. These photographs show Settle leaving the hospital with Vandiver's gun in his right hand. Upon reaching the parking lot, the photos show Settle approaching Willis as she begins to open her car door. At this point, Settle put Vandiver's gun to Willis' side and she screamed. Settle told her to shut up and then forced her into the car with him.

Although Willis was unaware at the time, her scream was heard by a hospital employee who called security to report the incident and gave a description and license plate number of Willis' car. Settle ordered Willis to drive him away from the hospital. She drove on West Forest toward Hollywood. She then turned onto Hollywood and got on the Bypass. She took the Bypass to Airways and turned onto Airways heading toward the airport. This road would eventually take her to Exit 66 at Interstate 40. Willis got onto Interstate 40 and began to head west toward Memphis. From this point, a car chase ensued. Trooper Greg Regan, of the Tennessee Highway Patrol testified, in relevant part, as follows concerning this chase:

---

[2] According to trial Exhibit 3, Settle pled guilty to two counts of robbery, four counts of aggravated robbery, and one count of theft over $1,000.

[3] Vandiver acknowledged that Settle must have had a handcuff key hidden on his person in order to have enabled him to remove the leg iron.

Q. Would you relate to the ladies and gentlemen of the jury, please, what your recollection is of the incident and events that occurred that morning as it concerns the interception of that automobile.

        *             *             *

A. Somewhere around 7:30 and 8:00 I can't specifically say exactly what time frame, I was radioed by dispatch that there was a pursuit involving a vehicle, escaped prisoner, from Jackson that had a hostage in the vehicle and I was to proceed to the interstate to help in apprehension of the vehicle and the suspect, so I and another trooper – a few more troopers went to the county line where Shelby and Fayette County line is somewhere around the 28 mile marker on I-40 and waited for the vehicle. A few minutes later I saw some blue lights and a vehicle coming up so I pulled out into traffic to try to slow the vehicle down. The vehicle got behind me, I was trying to block him in and somehow he got in the median and come back out of the median and passed me and continued on. At that time I noticed a Fayette County Deputy pass me, which was behind the suspect vehicle, and they continued forward. I don't know exactly what mile marker it was. The Fayette County Deputy passed the suspect vehicle and the vehicle was between me and the Fayette County Deputy in the inside lane. The Fayette County Deputy slowed down. The suspect vehicle struck the deputy's vehicle in the rear, and then went on around in the outside lane and the deputy slowed down a little bit. I proceeded to catch up with the vehicle, got behind the vehicle and pulled into – he was in the outside lane. I pulled into the inside lane and got up beside the vehicle and that's when I noticed – I saw the hostage in the back and I could see the suspect did have a weapon on him and he was reaching back in the back seat and pushing the victim's head back down in the floorboard. At that time when he seen me beside of him – when he seen me pull up beside of him he reached his weapon around – the window was up but he was pointing the gun at me and that's when I, without hesitation, pulled my service weapon out and then I slowed back down. Somewhere about – a few seconds later his car started overheating or losing some radiator fluid and it was slowing down and at that time I – we were coming up on somewhere around the 22 – 22 or 23 mile marker and it was rush hour traffic in Memphis and I knew if he got to the 18 mile marker that we was going to have probably a catastrophe on our hands so at that time I tried to ease over and I was about to bump him off the road when all of a sudden he just veered off onto the emergency shoulder and went down and stopped in what I like to call small brush, like

-3-

briers and stuff like that, in a brushy area, and he jumped – I went in front of him and he had stopped and he jumped out of the vehicle and takes off in the woods and that's when I began foot pursuit after the escaped prisoner and he ran for several – I don't know, several hundred yards and I lost sight of him, and that's when I called dispatch to have them get a search unit out so we could find the escaped prisoner.

\*　　　　\*　　　　\*

Q. During the course of the chase were you able to record or clock the speeds that you were traveling when you pulled along side the vehicle that was being driven at that time, I believe, by the suspect?

A. I wasn't exactly clocking the vehicle. I did notice we were traveling in excess of 110 miles an hour at times and then we tried – we were trying to block him to keep him out of the Memphis traffic, or to slow him down and we were traveling sometimes over 110 and sometimes as low as 90 but I don't think we got below 75 or 80 miles an hour until he went off the road.

Q. Is there any doubt in your mind that it was the suspect, Mr. Settle, that was actually driving the vehicle at or around the time you picked it up?

A. Yes, sir, it was him.

Q. Where was Ms. Willis located in the car then?

A. When I seen the victim she was in the back seat and he would push her down in the back seat. Several times, I don't know how many times he was pushing her down in the back seat.

Concerning Ms. Willis' condition when the troopers got to the car after Settle fled, Sergeant W.P. Sonny Taylor, of the Fayette County Sherriff's Department, testified, in relevant part, as follows:

Q. At the time that the car eventually stopped or the accident occurred, were you – did you actually stop at that point in time, along with the rest of the troopers?

A. Yes, sir? I jumped out with the other trooper that he [Settle] was trying to hit his car with – that he pulled the weapon on. We both jumped out of our vehicles and went running down the tree line. The

-4-

trooper took off after him and I pulled the lady out of the car. She [Willis] was about to go in shock and by that time some other troopers pulled up and there was a female trooper there and I took her over and asked the female trooper to watch her. I set her down because she was fixing to – she was in bad shape. She was shaking all over.

Q. Can you give us a – you are giving a little bit of general description as to Ms. Willis.

A. Yes, sir.

Q. Can you give me your best physical description of what she looked like at the end of that chase, if you can?

A. I mean, she was a nervous wreck. The only thing I could see, you know, physically, she was shaking all over and she was crying and, you know, the only thing I could tell was thinking she was going into shock, because she was really addled at the time. She didn't know what to do and he was hunkered up in the car and I wanted to get her away from the car right away.

Willis was taken back to Jackson to the hospital, where she was treated and released that same day. On August 17, 1999, Willis had her first appointment with Dr. Richard Spring, a psychologist. Willis continued to see Dr. Spring through November of 2001.

On August 14, 2000, Willis filed suit against Settle and CCA.[4] Willis specifically asserted that CCA had breached the duty it owed to Willis in the following ways:

> a) Failure to properly supervise inmate, Mike Settle.
> b) Failure to keep a known violent felon in custody.
> c) By failing to protect the general public and the plaintiff by keeping [Settle] in custody.
> d) By removing the defendant from a lockdown facility and taking this defendant to a public hospital where there was an increased likelihood of harm being caused to the public at large.
> e) Failing to take adequate precaution to protect the plaintiff from harm.

---

[4] Settle was an original Defendant in this suit. However, on February 21, 2003, the trial court entered an "Order of Dismissal for Failure to Prosecute as to Defendant Mike Settle." Settle is not a party to this appeal.

Willis prayed for both compensatory and punitive damages stemming from medical bills, lost earnings, and severe emotional and psychological injury. CCA filed its Answer on September 26, 2000, in which it denied any breach of duty. The case was tried to a jury on February 20 and 21, 2003. The jury found CCA liable to Willis and assessed damages at Five Hundred Thousand Dollars ($500,000). Judgment was entered for Willis in this amount on March 3, 2003. On April 2, 2003, CCA filed its "Motion for Directed Verdict or Alternatively for New Trial," along with a Memorandum of Law in support thereof. Willis filed her Response to CCA's Motion on July 22, 2003. CCA's Motion was denied by Order of February 3, 2003.

CCA appeals and raises five (5) issues for review as stated in its brief:

> 1. Whether or not the Public Duty Doctrine applies to Defendant, Corrections Corporation of America and specifically, whether or not Defendant only owes a duty to the public as a whole and not to specific individuals, such as the Plaintiff.
>
> 2. Whether the jury erred in granting a verdict to the Plaintiff when the injury inflicted upon the Plaintiff was not foreseeable. Additionally, CCA, was not shown to be negligent or at fault in guarding the prisoner at the time of the incident at issue in this matter or as to the properly enacted policies and procedures. Therefore, CCA should not have been liable in this ruling.
>
> 3. Whether the jury award was against the weight of the evidence presented at trial and was not within the range of reasonableness.
>
> 4. Whether the jury award of compensable damages to Plaintiff was excessive.
>
> 5. Whether the trial court erred in not granting Defendant's Motion for a Mistrial.

We first note that our review of the judgment entered on the jury's verdict is governed by Tenn. R. App. P. 13(d), which provides that "[f]indings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Under this standard of review, we "are not at liberty to weigh the evidence or to decide where the preponderance lies, but are limited to determining whether there is material evidence to support the verdict." *Crabtree Masonry Co. v. C & R Constr., Inc*., 575 S.W.2d 4, 5 (Tenn.1978). In making this determination, we are "required to take the strongest legitimate view of all the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and to discard all to the contrary." *Id.* If the record contains any material evidence to support the verdict, we must affirm the trial court's judgment. *See id.*; *accord Forrester v. Stockstill*, 869 S.W.2d 328, 329 (Tenn.1994).

**Whether or not the Public Duty Doctrine applies to Defendant,
Corrections Corporation of America and specifically, whether
or not Defendant only owes a duty to the public as a whole and
not to specific individuals, such as the Plaintiff.**

CCA did not raise the defense of the Public Duty Doctrine in its Answer, at trial, or in its post-trial motions, but it now asserts that, as a private contractor assuming a state function, it is immune from liability to Willis. The question of whether sovereign immunity extends to private prison contractors has been settled by the legislature. In T.C.A. § 47-24-108(b), Tennessee clearly declines to extend sovereign immunity to private prison operators, to wit:

> The sovereign immunity of the state shall not apply to the contractor. Neither the contractor nor the insuror of the contractor may plead the defense of sovereign immunity in any action arising out of the performance of the contract.

*Id.*; *accord Richardson v. McKnight*, 521 U.S. 399, 412 (1997); *Martin v. State of Tennessee*, No. M1999-01642-COA-R3-CV, 2001 WL 747640 (Tenn. Ct. App. July 5, 2001). In the absence of sovereign immunity, we decline to address the question of whether CCA is entitled to immunity under the Public Duty Doctrine. The Public Duty Doctrine is an affirmative defense. *Chase v. City of Memphis*, 971 S.W.2d 380, 385 (Tenn. 1998). Tenn. R. Civ. P. 8.03 requires that "a party shall set forth affirmatively facts in short and plain terms relied upon to constitute ... an avoidance or affirmative defense." The Rules of Civil Procedure also provide for the waiver of such a defense. Rule 12.08 states that "[a] party waives all defenses and objections which the party does not present either by motion as hereinabove provided, or, if the party has made no motion, in the party's answer or reply." As noted above, CCA did not raise the Public Duty Doctrine in its Answer, or at trial. Consequently, CCA waived the defense. Tenn. R. Civ. P. 8.03; Tenn. R. Civ. P. 12.08. Furthermore, CCA did not set out any alleged error, concerning the Public Duty Doctrine, in its Motion for New Trial. Tenn.R.App.P. 3(e) provides in pertinent part:

> Provided, however, that in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, *unless the same was specifically stated in a motion for a new trial*; otherwise such issues will be treated as waived. ...

(Emphasis added).

Because the motion for new trial filed by CCA does not specifically set out any alleged error concerning the Public Duty Doctrine, under Tenn. R. App. P. 3(e), this issue is waived. We now turn to Appellant's remaining issues.

**Whether the jury erred in granting a verdict to the Plaintiff
when the injury inflicted upon the Plaintiff was not foreseeable.
Additionally, CCA, was not shown to be negligent or at fault
in guarding the prisoner at the time of the incident at issue in this
matter or as to the properly enacted policies and procedures.
Therefore, CCA should not have been liable in this ruling.**

A negligence claim requires a plaintiff to prove the following elements: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to breach of the duty; (3) an injury or loss; (4) causation in fact; and (5) proximate causation. *See, e.g., Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993). The duty element is a question of law requiring the court to determine "whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant." *Id*. at 870 (quoting W. Page Keeton, Prosser & Keeton on Torts, § 37 at 236 (5th ed. 1984)). Consequently, we must review the issue of whether CCA's owed a duty to Willis *de novo* upon the record with no presumption of correctness.

The Complaint alleges that CCA "had a responsibility, duty and obligation to secure, protect and guard the prisoner who was being treated at Jackson-Madison County General Hospital." In Paragraph 11 of its Answer, CCA admits that it "was responsible for transporting Inmate Settle to Jackson-Madison County General Hospital, and that it was responsible for providing security for Inmate Settle during his stay at Jackson-Madison County General Hospital." The specific responsibilities of the CCA officers, in carrying out this duty, are more fully outlined in the Post Order, admitted into evidence as Exhibit 1. The Post Order reads, in pertinent part, as follows:

### I. REQUIREMENT:

One (1) or two (2) correctional officers as appropriate.

\*                              \*                              \*

### IV. PREFACE:

When performing duties in an outside hospital, you as the officer in charge, are expected to provide a safe and secure environment for inmate patients in your charge and the general public...

\*                              \*                              \*

## VI. SPECIFIC DUTIES:

A. Supervision of inmates in outside hospitals will be as follows:

*                                    *                                    *

    2. Minimum restricted through maximum custody inmates require two (2) armed correctional officers per inmate with restraints (leg irons) required, unless medically prohibited.[5]

*                                    *                                    *

H. You are to remain with the inmate at all times. Should the doctor tell you to leave the inmate, you will inform the doctor that you[r] instructions require your presence at all times. If the doctor still insists that you leave the inmate, you will contact the institution for further instructions.

I. All inmates shall be shackled to their beds as an added security measure. Shackles will not be removed until approval is received from the shift supervisor or higher. When approval is received, you will remove the shackles just prior to treatment, and reapply immediately upon completion of treatment. If restraints are medically prohibited, you will get authorization from the shift supervisor, or higher, before leaving the restraints off. If restraints need to be removed, one (1) correctional officer will give his/her weapon with the action open to the other correctional officer before taking off the restraints.

*                                    *                                    *

K. When you require personal relief, the relief person will be a correctional officer.

*                                    *                                    *

N. You are to remain in the room occupied by the inmate at all times. You are to never leave the inmate unattended. The officer should position himself/herself in a manner that will provide security to Inmates while being observant to individuals entering the room.

---

[5] It is undisputed that Settle was classified as a medium security inmate.

*                                    *                                    *

Q.  Security of Weapons:

    a.    Officers assigned a firearm or other security type equipment shall be constantly alert to the possibility of personal assault by the inmate or other nearby persons. Officers assigned these types of equipment shall be on continuous guard for such events and limit, as much as possible, close contact with the inmates and others.

    b.  Revolvers shall remain secured in the holster with the retaining strap buckled.  The holster shall be fastened to the belt in a manner that does not allow the holster to be pulled apart or away from the body.

    c.  When escorting an inmate or group of inmates, the armed officer(s) shall position himself/herself to reduce exposure of the weapon toward the inmate(s)....

*                                    *                                    *

## VIII.  KEY CONTROL:

A.  Handling of Security Keys:

*                                    *                                    *

    7.  Do not permit an inmate to handle any security keys under any circumstances.

*                                    *                                    *

## XIV.  SUMMARY:

A.    It is essential for each employee to have a good working knowledge of these post orders.  The employee must study them, understand them, and implement them.

B.  Post orders cite general and specific duties for operation of this post.  They cannot, however, cover every incident or situation which may occur.  The employee assigned to this post shall use good

judgment, tact, and give careful attention to detail in discharging his/her duties whether referenced in post orders or not.

C. If an employee is unclear what the post orders require, he/she shall contact their supervisor and obtain clarification.

D. No employee shall be allowed to work this post before they have read and understood the post orders and have signed the signature sheet...

We now turn to the record to determine whether there is any material evidence on which the jury could have found that CCA, through its employees, breached a duty. Officer Crowder testified, in relevant part, as follows:

Q. Now, Mr. Crowder, you left the room at some point in time prior to Mr. Settle escaping, isn't that correct?

A. Yes, sir.

   *                        *                       *

Q. And it was required that two of you [correctional officers] remain in the room with him [Settle] at all times, wasn't it?

A. Yes, sir.

Q. And, so, knowing that that was a requirement of your facility you left Mr. Vandiver there alone with Mr. Settle? Do you recall that?

A. Yes.

   *                        *                       *

Q. Exhibit 1 [the Post Order]. Do you see where it specifies "Specific duties"?

A. Yes, sir.

Q. All right. Do you see where it says "Supervision of inmates in outside hospitals will be as follows:"

A. Yes, sir.

Q. Read for us, if you would, A-2.

A. Minimum restricted through maximum custody inmates require two (2) armed correctional officers per inmate with restraints (leg irons) required, unless medically prohibited.

Q. It doesn't say two unless somebody gets hungry and wants a meal ticket, does it?

A. No, sir.

Q. And, it doesn't say that you are permitted to leave the facility or to leave that prisoner with one guard at any given time, does it?

A. No, sir.

\*                              \*                              \*

Q. So you agree with me then, Mr. Crowder, that you violated your own company's policy when you made the decision to leave Mr. Vandiver there alone to go down and get a meal ticket?

A. Yes, sir.

Officer Vandiver's testimony indicates numerous policy violations:

Q. So, what type of training do you have as it relates to the proper protocol and procedure as far as carrying firearms around prisoners?

A. In this hospital duty, we are supposed to hand our weapons over to the other officer if we get close to the inmates [pursuant to Section VI(I) of the Post Order].

\*                              \*                              \*

Q. And, where was your revolver when you unleashed or unshackled Mr. Settle?

A. I still had it [the revolver] on.

Q. And , where was it precisely on your person?

A. Right side.

-12-

Q.  And, was it strapped [pursuant to Section VI(Q)(b) of the Post Order]?

*                                    *                                    *

A.  No, it was–

Q.  Was it strapped on this particular day?

A.  No, sir, there wasn't no strap on the weapon holder.

*                                    *                                    *

Q.  Mr. Vandiver, at the time Mr. Crowder left to get the meal ticket was Mr. Settle chained to the bed [pursuant to Section VI(I) of the Post Order]?

A.  Yes, sir.

Q.  And, how exactly was he secured to the bed?

A.  One leg to the foot of the bed....

*                                    *                                    *

Q. It [the Post Order] says "All inmates shall be shackled to their beds....  Shackles will not be removed until approval is received from the shift supervisor or higher."... You [Vandiver] never sought to get approval prior to releasing Mr. Settle from the bed, did you?

A.  No, sir.

Q.  So, would you agree with me, then, as it relates to that provision of your facility policy that you violated it, as well when you released Mr. Settle?

A.  Yes, sir.

*                                    *                                    *

Q.  Mr. Vandiver, did it ever occur to you that you were putting yourself at risk as well as other people at the hospital when you made that decision to unshackle this prisoner with no strap on your holster

-13-

and you the only guard in the room at the time? Did that ever occur to you at all?

A. Yes, sir. I thought about it.

Q. But in spite of having thought about it you went ahead and did it anyway?

A. Yes, sir.

From this testimony, there is ample evidence from which the jury could have found that a duty was breached.

## Foreseeability

In order to establish proximate causation and, ultimately, negligence, the claimant must show that "the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence." *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn.1991). As stated in *Ray Carter, Inc. v. Edwards*, 436 S.W.2d 864, 867 (Tenn. 1969), "an injury which could not have been foreseen nor reasonably anticipated as a probable result of an act or omission is not actionable, and such an act is either the remote cause or no cause of the injury." As the Supreme Court stated in *McClenahan*, the foreseeability requirement

> is not so strict as to require the tortfeasor to foresee the exact manner in which the injury takes place, provided it is determined that the tortfeasor could foresee, or through the exercise of reasonable diligence should have foreseen, the general manner in which the injury or loss occurred. [citations omitted] "The fact that an accident may be freakish does not per se make it unpredictable or unforeseen." *City of Elizabethton v. Sluder*, 534 S.W.2d 115, 117 (Tenn.1976). It is sufficient that harm in the abstract could reasonably be foreseen. *Shell Oil Co. v. Blanks*, 46 Tenn.App. 539, 330 S.W.2d 569, 572 (1959).

*McClenahan*, 806 S.W.2d at 775. Foreseeability is a question of fact to be determined by the jury. *City of Elizabethton v. Sluder*, 534 S.W.2d 115 (Tenn. 1976).

From our review of the entire record in this case, we find that it was foreseeable that Settle could escape and, having escaped, it was foreseeable that he could take a hostage. It is undisputed that Settle was a medium security prisoner at all times pertinent to this case. It is also uncontested that CCA required its officer to keep leg irons on Settle at all times, unless the officer obtained permission from his or her supervisor prior to removing the shackles. As discussed in detail, *supra*, there were numerous precautionary policies in place all for the purpose

-14-

of insuring that this prisoner would not escape. Given the nature of these policies, it is reasonably foreseeable that, should any of them be disregarded, as in this case, the prisoner might escape.

Once Settle escaped, given the fact that he had Officer Vandiver's weapon, it was reasonably foreseeable that he might use that weapon against someone. In his testimony, Officer Vandiver admits that the situation that occurred with Willis was foreseeable:

> Q. Mr. Vandiver, was it not foreseeable, sir, that he [Settle] had the weapon pointed at your head that he could have also have taken the weapon and pointed it at someone else's head, such as an employee of the hospital, such as somebody like Ms. Willis?
>
> A. Yes, sir, that's the reason I didn't force him to shoot me he would have been out shooting the rest of the way down the hallway.

We find that the record supports the jury's finding that the events of August 16, 1999 were foreseeable. We now address the elements of cause in fact and proximate causation.

"Causation, or cause in fact, means that the injury or harm would not have occurred 'but for' the defendant's negligent conduct." ***Kilpatrick v. Bryant***, 868 S .W.2d 594, 598 (Tenn.1993). "Proximate causation is a jury question unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome." ***McClenahan v. Cooley***, 806 S.W.2d 767, 775 (Tenn.1991).

In ***Kilpatrick v. Bryant***, 868 S.W.2d 594 (Tenn.1993), our Supreme Court said:

> Causation and proximate cause are distinct elements of negligence, and both must be proven by the plaintiff by a preponderance of the evidence. Bradshaw [v. Daniel ], 854 S.W.2d [865, 869 (Tenn.1993) ]; McClenahan v. Cooley, 806 S.W.2d 767, 774 (Tenn.1991); Smith v. Gore, 728 S.W.2d 738, 749 (Tenn.1987). "Causation (or cause in fact) is a very different concept from that of proximate cause. Causation refers to the cause and effect relationship between the tortious conduct and the injury. The doctrine of proximate cause encompasses the whole panoply of rules that may deny liability for otherwise actionable causes of harm." King, Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Injuries and Future Consequences, 90 Yale L.J. 1353, 1355 n. 7 (1981). Thus, proximate cause, or legal cause, concerns a determination of whether legal liability should be imposed where cause in fact has been established. McKellips v. Saint Francis Hosp., 741 P.2d 467

-15-

(Okla.1987). "Cause in fact, on the other hand, deals with the 'but for' consequences of an act. 'The defendant's conduct is a cause of the event if the event would not have occurred but for that conduct.' " Id. at 470 (quoting Prosser and Keeton, The Law of Torts 266 (5th ed.1984)).

*Id*. at 598.

In Tennessee, there is a three-pronged test for proximate causation: (1) the tortfeasor's conduct must have been a "substantial factor" in bringing about the harm being complained of; and (2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and (3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence. McClenahan v. Cooley, 806 S.W.2d 767, 775 (Tenn.1991).

We find that the record in this case supports the jury's finding that the actions of CCA's employees were both the cause in fact and the proximate cause of Willis' injuries.

## Respondeat Superior

CCA contends that it cannot be held responsible for the actions/inactions of its employees, Vandiver and Crowder, under the doctrine of respondeat superior, because Officers Vandiver and Crowder deviated from the course and scope of their employment by acting outside the policies and procedures set in place by CCA. We disagree.

The general rule in Tennessee is that a principal is liable for the negligence or wrongful acts of his agent acting within the actual or apparent scope of his employment in the principal's service. *See, e.g.*, 1 Tenn. Juris., Agency, § 47 (1982); *V.L. Nicholson Co. v. Transcon Inv. and Financial Ltd., Inc.*, 595 S.W.2d 474, 483 (Tenn.1980); *McGee v. County of Wilson*, 574 S.W.2d 744, 746- 47 (Tenn. Ct. App.1978). This respondeat superior liability exists where the principal has a right to control the agent. *See Doane Agric. Serv., Inc. v. Coleman*, 254 F.2d 40, 43 (6th Cir.1958), cert. denied, 358 U.S. 818 (1958). Our Supreme Court has recognized that "a servant, acting within the general scope of his authority, makes the master responsible, even though he act without instructions, or exceed his instructions." *Louisville & N.R. Co. v. Marlin*, 186 S.W. 595, 596 (Tenn.1916). This responsibility on the part of the principal exists even where the injured party is "wholly a stranger" to the principal. *Id*. The question of whether an agency relationship exists and the scope of the agent's authority are questions of fact. *See Mays v. Brighton Bank*, 832 S.W.2d 347 (Tenn. Ct. App.1992); *Board of Directors of City of Harriman School Dist. v. Southwestern Petroleum Corp.*, 757 S.W.2d 669 (Tenn. Ct. App.1988).

The gravamen of respondeat superior is that the master may be sued even though the master is not personally at fault. *See, e.g., Rankhorn v. Sealtest Foods*, 479 S.W.2d 649 (Tenn. Ct. App. 1971). Here, CCA had policies in place to prevent the escape of prisoners. While we

may concede that Officer Crowder was outside the scope of his employment when he left Settle's hospital room to retrieve the meal tickets, at all times pertinent to this case, the record reflects that Officer Vandiver was at his post. The fact that Vandiver disregarded CCA policies in carrying out his duties does not remove him from the scope of his employment. Rather, it evinces negligence in the performance of those duties, which makes CCA answerable for Vandiver's actions under the doctrine of respondeat superior.

We will now address Appellant's second and third issues, concerning the award of damages, together. We first note that counsel for Willis withdrew the question of punitive damages prior to the trial. Concerning its award of damages, the jury was instructed, in relevant part, as follows:

### PERSONAL INJURY–PAIN AND SUFFERING

> Plaintiff may be awarded the following elements of damage experienced in the past:
> Physical pain and suffering
> Mental or emotional pain and suffering
> Loss of capacity for the enjoyment of life
> You may also award compensation for the present cash value of:
> Physical pain and suffering
> Mental or emotional pain and suffering
> Loss of capacity for the enjoyment of life reasonably certain to be experienced by the Plaintiff in the future.
> Pain and suffering encompasses the physical discomfort caused by an injury. Mental or emotional pain and suffering encompasses anguish, distress, fear, humiliation, grief, shame or worry. Damages for loss of enjoyment of life compensate the injured person for the limitations placed on the ability to enjoy the pleasures of life.
> There is no mathematical formula for computing reasonable compensation for [physical pain and suffering] [mental or emotional pain and suffering] [loss of capacity for the enjoyment of life], nor is the opinion of any witness required as to the amount of such compensation.
> In making an award for such damages, you must use your best judgment and establish an amount of damages that is fair and reasonable in light of the evidence before you.

The jury awarded Willis $500,000 in compensatory damages. CCA asserts that this award is above the range of reasonableness and, as such, is not supported by the evidence. In a personal injury cases, the amount of damages to be awarded is primarily for the jury. *Brown v. Null*, 863 S.W.2d 425, 430 (Tenn. Ct. App.1993); *Clark v. Engelberg*, 436 S.W.2d 465, 468 (Tenn. Ct. App. 1968). It is not within the appellate court's province to substitute its judgment for that of

-17-

the jury. ***Id***.  No verdict is valid until it is approved by the trial court judge. ***See Cumberland Tel. & Tel. Co. v. Smithwick***, 79 S.W. 803, 805 (Tenn. 1904). Where, as in this case, the judge simply approves the jury's verdict without further comment, the appellate court presumes that the trial judge adequately performed his or her function as thirteenth juror. ***See Holden v. Rannick***, 682 S.W.2d 903 (Tenn.1984) (citing ***Central Truckaway Sys. v. Waltner***, 36 Tenn.App. 202, 253 S.W.2d 985, 991 (1952)). When the trial court has approved the verdict, our review is subject to the rule that if there is any material evidence to support the jury's award, it should not be disturbed. ***See Ellis v. White Freightliner Corp.***, 603 S.W.2d 125, 129 (Tenn.1980); ***Benson v. Tennessee Valley Elec. Coop***., 868 S.W.2d 630, 640 (Tenn. Ct. App.1993); ***Coyle v. Prieto***, 822 S.W.2d 596, 601 (Tenn. Ct. App.1991); ***Cary v. Arrowsmith***, 777 S.W.2d 8, 23 (Tenn. Ct. App.1989). As stated in ***Ellis***,

> [e]ach case must depend upon its own facts and the test to be applied by us is not what amount the members of the court would have awarded had they been on the jury, or what they, as an appellate court, think should have been awarded, but whether the verdict is patently excessive.

***Ellis***, 603 S.W.2d at 129.

Although CCA contends that Willis' damages should have been limited to her medical expenses ($3,462) and her lost wages ($1,202), as noted above, the jury was clearly instructed that compensatory damages may include "mental or emotional pain and suffering" and "loss of capacity for the enjoyment of life."  As further noted in the jury instructions, there is no mathematical formula to place a price on the trauma Willis suffered at the hands of Settle or on the long term effects of that experience.

Concerning the events of August 16, 1999, Willis testified, in relevant part, as follows:

> Q. Ms. Willis, describe for these folks on the Jury, if you will please, when is the first time you noticed Mr. Mike Settle that morning of August 16, 1999?
>
> A. As I was walking to my car I happened to look back and I seen this man coming up but I just walked to my car as I usually do and get in my car and he came up behind me and said "Sister, let me have your car." I said "My car?" and he said "That's all right. I don't need your car, you can drive." And I said "Drive where?" He said "I need to get to Memphis." "I don't know how to get to Memphis." He said "We'll find a way how to get to Memphis." I said "But I don't know how. I just don't know how." And he said "We will find our way." By that time he came out with his gun and put it up to my head and I hollered out "Oh, help me please." And he told me "Don't do that.

You do it again and there will be a very big problem." I didn't want to get hurt so I got in the car and did not go on the passenger side. He got in where I was driving on the driver's side, so he took the gun and he put it to my head and then he put it in my ribs and he grabbed my arm and said "Get in the car." And by that time I had started crying and he said—"Stop crying, there's going to be a problem if you don't." So I—

Here, a break was taken to allow Ms. Willis to compose herself. Her testimony continued as follows:

Q. Where was he [Settle] in the car with you at the time that you were leaving the hospital?

A. He was on the passenger side.

Q. Okay, where was the gun?

A. Sticking in my side.

Q. At that point did you feel that he was—that you were in fear of your life?

A. Yes, I was.

Q. And, as you were driving out of the parking garage did he shout or yell instructions to you at that point?

A. He said "Hurry, back out. Back out." So I was trying to back out and almost backed into another car and he said "Straighten up. Straighten up this car. Act normal, I said, because if you give attention to us there's going to be a problem. It's going to be you."

*                         *                         *

Q. When you were first approached by Mr. Settle—I meant to ask you that—in the hospital parking garage, as you testified before the break, that you screamed and he told you not to do that.

A. He said if I did it again I was going to be very sorry.

Q. Did you know whether or not anyone heard you scream?

A. No, I didn't.

-19-

Q. As you were driving out of the garage did you feel like anybody knew where you were or what was going on at all?

A. No, I didn't.

\*                                        \*                            \*

Q. Was he telling you how to drive?

A. Yes, he was "Drive faster, drive faster." I said "I will get a ticket." He said "You are going to get more than that if you don't drive faster."

Q. Did he continue to use the gun as a way–

A. He kept shoving it in my side, yes, he did.

\*                                        \*                            \*

Q. And, as you were driving along I-40 going to Memphis did you notice any police at that point in time just as you got on the interstate?

A. Yes, as I got on the interstate I seen a police pull off to the side like he was resting or something. I don't know what he was doing, but it was a police car sitting to the side and Michael [Settle] kept shoving the gun in my side and telling me to drive faster and as I was driving faster I seen a state trooper on the side of the highway and then as we got a little further on down the highway a state trooper was coming from–like from Memphis and he passed right beside me on the driver's side and he turned around and by that time Michael [Settle] looked back and he said "There is going to be a problem. Drive, drive." And he kept shoving the gun into my side.

\*                                        \*                            \*

Q. All right. At some point in time while you were driving down the interstate did Mr. Settle become angry with you and upset about the way you were continuing to drive?

A. Yes.

Q. What did he do to take care of that problem?

A. He took and stuck his feet on top of my feet, on top of the gas pedal, and pushed it to the floor?

Q. And, you were trying to steer the car?

A. I was trying to steer the car and then as I was trying to steer the car and he took–we were like going down an embankment as we was going into Memphis, and I was thinking the car was going to turn over and I was shaking by the[n] and he grabbed the car–grabbed the steering wheel and straightened it back up and by the time I seen some state troopers and he said "It's going to be a problem; it's going to be a very big problem." Just like that and as I noticed to the side of me I seen a Fayette County state trooper was pulling up by side of us and he [Settle] seen him and he told that state trooper to get back, there was going to be a big problem. He took the gun and he pointed it. He said "It's going to be a problem. Going to be a big problem." And by that time the state trooper kind of slowed down to back off from us and then I started driving again and he said "You're not driving fast enough." And he put his foot back on my foot to make it drive faster then all of a sudden he just jumped over me and knocked me into the door and jumped in my lap and he said "You are going to get in the back." And about that time he could see more state troopers had approached us and he made me get in the back seat.

Q. So he switched places with you?

A. Yes.

Q. Did he at any time slow the car down at all?

A. Naw, he was driving with one hand and keeping the gun on me with the other hand and told me to "Get in the back; get in the back," just like that so I did. I went over in the back seat.

Q. When you got into the back seat of the car did you sit up in the back seat or where were you as–

A. At the time I was sitting down and he grabbed my head and pushed it down and then as I went to raise up he pushed me again and he said "I am not going out like this, I am not going out like this. I am not going out like this." And I could hear him like cocking the gun and that's when he just–seemed like he took off and he said "I am not going out like this. I am not going out like this."

          *                              *                         *

          Q. Can you describe for the Jury how it [the chase] ended?

          A.  Well, the state troopers had us like blocked in both ways and
          some kind of way he grabbed the steering wheel and wheeled out in
          front of all of the state troopers and something exploded in my car
          and went "whoof," something like that, and he lost control of the car
          and that's when we went into the woods.

          Q.  When the car came to rest were you able to see from where you
          were in the car–

          A.  I was down on the floor of the car.  I was on the floor of the car in
          the back seat.  I was down on the floor and as he got out of the car he
          said "I am not going out like this."  And I was trying to open the door
          but I couldn't get it open and as they [the troopers] approached the
          door fell open and I fell out on the ground and that's when the other
          state troopers approached me with they [sic] guns on me.

          Q.  Did you feel like even then, after the car came to a complete rest,
          that you may still be in danger?

          A.  Yes, I did.

          Q.  Did you know where he [Settle] was or what had happened to him
          or where he had gone?

          A.  No, sir, I did not.

       Concerning her symptoms and the disruption to her life since August 16, 1999, Willis
testified, in pertinent part, as follows:

          Q. Ms. Willis, what were some of the problems you were having that
          made you want to see Dr. Spring over the time that you saw him?

          A.  I was having nightmares.  I would wake up crying and every time
          I hear a noise I was jumping and I sometimes I didn't go to sleep.  I
          would sit up all night.

          *                              *                         *

-22-

Q. Prior to August 16, 1999, had you ever needed counseling or therapy or sessions of any type like that at all?

A. No.

Q. What effect did the incident of August 16, 1999, have on your–on your just average daily life?

A. I began to stay in the house. I didn't want to talk to nobody. I would lock the doors and stay in the house all the time. I didn't talk to nobody on the phone. I stayed in the house all the time.

*                                        *                          *

Q. And, even though you have been able to go without having to continue to see him [Dr. Spring] for some period of time, are you still continuing to have problems dealing with what happened to you on August 16, 1999?

A. Sometimes.

Q. When are the times that it is the worst?

A. Mostly like when I walk at work and walking down the hall I look behind me. I look behind to see who is it or something like that, because when I went back to work I had to have security to escort me to my car every night.

*                                        *                          *

Q. Okay, Ms. Willis, is there any other things in your life now that are different than they were before August 16, 1999–that are different because of what happened on August 16, 1999?

A. I am still a little afraid. A lot of things I used to do I don't do them like I used to. I still kind of shy off and stay at home.

CCA points, *inter alia*, to the fact that Willis has not required regular sessions with Dr. Spring for some time, and to the notation that Dr. Spring made in February 2001 that "Finally may be through with it. Life normal now," for the proposition that Willis is no longer suffering the effects of August 16, 1999. We disagree. A closer examination of Dr. Spring's testimony indicates that, although Willis goes through periods of normalcy, certain events can trigger a recurrence of her symptoms at any time, to wit:

-23-

Q. Okay. What does that [the time between sessions] indicate to you, Doctor, as it relates to the progress or recovery that Ms. Willis was showing at that time.

A. Well, this has really been kind of a recurring theme. Any time that we had a long gap between meetings the reason that we did was because I felt that she had reached a pretty good point in resolution of the symptoms and then what would happen is that something would come along and trigger it again and reveal the fact that contrary to my wishes there was a residual vulnerability and it was still possible to mobilize the symptoms to a pretty high level. That happened again and again.

Q. Okay. What does it indicate to you as a clinical psychologist as it relates to Ms. Willis' condition and the symptoms that she is exhibiting?

A. Well, I guess really I think this. I think on the one hand that she made a lot of progress and showed an ability to benefit from therapy. At the same time [it] just doesn't disappear and this is something that is persisting. Essentially it goes into a latent state when conditions are right and then under conditions where something stimulates or triggers the traumatic process then once again we get a resurgence of symptoms.

*                          *                          *

Q. Doctor, what has been your experience as it relates to treatment of patients who are diagnosed with Post Traumatic Stress Disorder? Have you treated several patients with that condition?[6]

A. Oh, yes, quite a few.

Q. And, is there any way to realistically determine when or if someone is going to be able to "be cured," for lack of a better term for that type of condition? Is that even possible?

---

[6] Dr. Spring testified that Willis does not suffer from full Post-Traumatic Stress Disorder ("PTSD"). Rather she has "residual vulnerability," or "Partial PTSD".

A.  Well, I always hope that it is possible, but I have to say in thinking back, I am not able to pull up a picture of anyone I feel was completely cured.

We have reviewed the entire record in this case and we find that there is material evidence to support the jury's award of $500,000 in compensatory damages. The verdict is supported by, among other things, evidence of the following: the trauma Willis experienced during the actual events of August 16, 1999; her pain and suffering; the degree of permanent impairment; and the impact of the injury upon her ability to work and move about. As discussed *supra*, Willis will likely continue to experience set-backs and recurrent symptoms. It is well-settled that a negligent party takes a plaintiff as the defendant finds him or her, and the injured plaintiff is entitled to recover all damages proximately caused by the acts of the responsible party. ***Haws v. Bullock***, 592 S.W.2d 588, 591 (Tenn. Ct. App.1979); ***Fuller v. Speight***, 571 S.W.2d 840, 841 (Tenn. Ct. App.1978). Although some individuals might recover quickly from a traumatic experience of this nature, the evidence does not suggest that Willis is among this group.

We find that the jury's verdict is supported by material evidence, ***Ellis***, 603 S.W.2d at 129, and that the award is not so excessive as to indicate that it was influenced by passion, prejudice, or caprice. Finding material evidence to support the jury's verdict, we decline to set it aside or to grant a remittitur.

### Whether the trial court erred in not granting Defendant's Motion for a Mistrial.

CCA asserts that Willis' show of "excessive emotion" at several points during the trial prejudiced the jury and should have resulted in a mistrial.  In the instant case, the trial court took precautions (i.e. asked counsel to switch tables) so that Willis would not be in the jury's direct line of vision.  When Willis became emotional on the stand, the trial court immediately stopped testimony and instructed Willis, during a break, that she would have to keep her emotions in check.  There were no further incidents following this instruction.

It is well settled that the decision of whether to grant a motion for mistrial is within the sound discretion of the trial court. ***See State v. McKinney***, 929 S.W.2d 404, 405 (Tenn.Crim.App.1996). This court will not disturb a trial court's denial of a motion for mistrial absent an abuse of discretion. ***State v. Adkins***, 786 S.W.2d 642, 644 (Tenn .1990); ***State v. Williams***, 929 S.W.2d 385, 388 (Tenn.Crim.App.1996).

In the instant case, the trial court was in a better position than this Court to observe the extent of Willis' emotions and the effect, if any, Willis' behavior had upon the jury.  From the record before us, we cannot say that Willis' emotions were so excessive or so prejudicial as to indicate an abuse of discretion by the trial court in not granting a mistrial.

-25-

For the foregoing reasons, we affirm the Judgment on the jury verdict. Costs of this appeal are assessed to the Appellant, Corrections Corporation of America, and its surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.