# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### NOVEMBER 27, 2007 Session

## DAVID GOFF, ET UX, ET AL. v. ELMO GREER & SONS CONSTRUCTION CO., INC.

### Direct Appeal from the Circuit Court for White County
### No. CC-320     John A. Turnbull, Judge

---

### No. M2006-02660-COA-R3-CV - Filed May 16, 2008

---

This appeal involves a jury's award of punitive damages. The construction company entered into a contract with the State of Tennessee to widen a portion of a highway. The homeowners entered into a contract with the construction company allowing the construction company to place excess materials generated from the highway project on the homeowners' property. In exchange, the homeowners would receive compensation based on the cubic fill area, and the company would fill and grade that portion of the homeowners' property. The project required that the construction company conduct extensive blasting near the homeowners' house and vehicles. One of the homeowners became concerned when he witnessed the construction company placing various garbage items and tires on his property near the fill area. After three years, the construction company finished the project. The homeowners brought suit, alleging that the company failed to pay the amount due under the contract and caused damage to their house due to the blasting. The complaint also alleged that the company buried certain items, including tires, on the property which constituted an environmental tort. The homeowners' amended complaint stated a cause of action in nuisance and also sought an award of punitive damages in the amount of $1 million dollars. The jury returned a verdict in favor of the homeowners for the nuisance claim in the amount of $3,305.00 and found that punitive damages should be imposed on the construction company. The jury found in favor of the construction company for the environmental tort claim. After the second phase of the trial, the jury returned an award of $2 million in punitive damages. The trial court remitted the award to $1 million, the amount of the homeowners' *ad damnum*. The construction company appeals, and we reverse and remand in part and affirm in part.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded in Part and Affirmed in Part

ALAN E. HIGHERS, PJ., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Linda J. Hamilton Mowles, Knoxville, TN, for Appellant

John C. Knowles, Sparta, TN; John P. Pryor, Smithville, TN; Jon E. Jones, Cookeville, TN, for Appellees

**OPINION**

### I. FACTS & PROCEDURAL HISTORY

David Goff and his wife, Joyce Goff, along with David's mother, Agnes Goff (collectively the "Goffs" or "Appellees") own approximately 400 acres on both the east and west sides of Highway 111 in Sparta, Tennessee. The highway runs directly in front and directly behind David and Joyce Goff's house located on a portion of this 400 acre tract. The State of Tennessee planned to widen Highway 111, and Elmo Greer & Sons Construction Company, Inc. ("Construction Company" or "Appellant") received the contract with the State to build six miles of the Highway 111 four-lane road.[1] The State's plan required that Construction Company widen the "cut" directly in front of the Goffs' home, which required extensive blasting. Construction Company sought to place the excess material that this process would generate on the Goffs' property. Construction Company and the Goffs entered into a contract whereby Construction Company could temporarily place the excess rock and dirt on the east side of the Goffs' property. The Goffs were to receive ten cents per cubic yard in exchange for Construction Company receiving the right to place "dirt, rock, and other excess material from the jobsite" on the Goffs' property. The agreement also provided that "the area[2] in which said material is to be deposited will be left in a neat and graded condition." Construction Company drafted the aforementioned contract.

---

[1] More specifically, Construction Company was the general contractor and subcontracted out the bridge work and paving. It performed the grading work.

[2] The contract describes the area as follows: "Right of +/- Station 375.00 S.R. 111." The Goffs contended at trial that the area was around five to seven acres. Construction Company contended at trial the area was around three to five acres. In any event, the exact size of the fill area is not determinative of the issues on appeal.

-2-

Construction Company began the project in March of 1994, and finished in 1997. The Goffs brought suit on June 30, 1998, alleging breach of contract due to Construction Company's failure to pay the ten cents per cubic yard for the use of the property. The Goffs also sought damages caused by Construction Company's blasting, claiming that rocks and debris flew onto their property, damaging their vehicles and house. The Goffs also alleged damages caused by Construction Company's burying of waste on the property:

> The defendants . . . have unlawfully and in violation of environmental laws buried refuse and other objects such as automotive parts, large earth moving rubber tires and other impermissible materials on the property of the plaintiffs[ ] . . . when disposition of such objects should have been made in compliance of environmental standards and which will likely result in damages to the real estate of these plaintiffs . . . .

Thereafter, the Goffs moved to amend their complaint, and the trial court granted leave to amend. The Goffs' amended complaint added the following claim of nuisance:

> [T]he defendant, its servants, agents and employees did commit acts of nuisance upon the land of the plaintiffs by spilling upon the property oil and petroleum products and by burying and concealing trash, garbage, waste products, rubber tires, oil filters, used and

-3-

discarded machinery parts, all without the permission or authorization of the plaintiffs and did thereby create an unauthorized, unlicensed and prohibited landfill . . . . As a result of the actions on the part of the defendant in creating and inflicting injury upon the plaintiffs, the defendant is liable to the plaintiffs for the costs and expenses of excavating, removing, and disposal of the waste materials buried upon the property of the plaintiffs in order to remediate and reclaim the real estate to the condition that the property was in prior to the commission of the acts of nuisance. The defendant shall also be liable to the plaintiffs for a fair rental value during the time that the defendant has used the property for the unauthorized landfill until the defendant has paid the cost of reclamation in order to restore the plaintiffs' property to its undamaged condition.

The Goffs' amended complaint also sought an award of $1 million in punitive damages: "Plaintiffs do further amend their complaint to demand compensatory damages of the defendant in the amount of Five Hundred Thousand ($500,000.00) Dollars, and an additional sum of One Million ($1,000,000.00) Dollars in punitive damages."

Trial commenced on June 28 and concluded on June 30, 2006. The parties stipulated that Construction Company was liable for breach of contract in the amount of $5,355.50, which represented 53,555 cubic yards of fill material that went onto the Goffs' property during

construction, at 10 cents a cubic yard. Both Mr. and Mrs. Goff testified as to the damage to their home and vehicles caused by Construction Company's blasting. Mr. Goff testified that Construction Company conducted blasting as close as 100 feet from their home, and oftentimes did not warn the Goffs prior to commencing blasting.[3]

As to the claim that Construction Company buried certain items on the Goffs' property, Mr. Goff testified as follows:

> [T]hey were staging equipment there [near the fill area] and doing oil changes and, you know, the ground is black . . . . They also repaired their equipment there, so when they took the thing apart, lots of oil and grease got on the ground.
>
> . . .
>
> I - - I became concerned. Well, they were spilling a lot of stuff there.
>
> . . .
>
> [A]s they were filling [ ] they were just putting anything out there in the fill and when I would approach them, [they said that] we'll take care of that. We'll take care of that.

---

[3] We need not get into great detail of the testimony concerning the property damage caused by blasting, as neither party appeals that issue. Nor is the strict liability claim relevant to the issue of punitive damages.

More specifically, Mr. Goff testified that he saw the following items in the fill area: "hydraulic lines, parts that say CAT on them, boxes that say CAT, Rotella containers. . . . That's a motor oil, I think. . . . Plastic, gallon, sort of like antifreeze comes in. . . . [R]ods and all, you know, just things that would come off big equipment." Mr. Goff also testified that he saw 55-gallon barrels and tires stacked in the area. This concerned him, so he asked the workers "'Guys, you're not going to bury anything on me except rock and dirt, right? That's our agreement[,]' to which the workers responded, 'Don't worry about it. We will clean it up. We're going to slope [the fill area] down to the road, and you're going to be real pleased with what we do.'"

Mr. Goff testified that he was especially concerned that Construction Company was burying tires on his property: "There was four or five tires . . . and it had big rocks on it . . . . Well, in seeing that, you know, you wouldn't think they'd dump them on there and then take them off and haul the tires off. So, I - - I got my camera and I made pictures. I also . . . went and told them, I said, it looks like you're fixing to bury some tires. Don't do that." None of the Goffs actually witnessed any of Construction Company's employees burying tires or any other improper materials.

The deposition of Construction Company's chief engineer, Lee Anderson, was read to the jury, and Mr. Anderson also testified at trial. Mr. Anderson supervised the Highway 111 project. As to the company policy concerning tires, he testified that "we use a lot of tires. Limestone rock punches holes in them and wears them out. As they become flat or unusable, we stack them up and then we haul them back [to Construction Company's home office] and we turn them back in. They have some value to them." Mr. Anderson testified that the tires are stacked, "then once we get them

- - get a full load, we send a truck to pick them up. . . . We inventory them and then they dispose of them. They are recapped. We reuse them on other equipment." Mr. Anderson testified that some tires are unsuitable for reuse, however, and that there is a financial cost associated with disposing of these tires.

Mr. Anderson conducted the final inspection of the fill site upon completion of the project: "I reviewed the project to see how much equipment, how much materials were left and . . . what kind of trucks the shop should send to pick up what we had left over." Mr. Anderson observed tires lying on the completed fill area, so he "called the shop and told them to come pick up the equipment, and the tires, and any other surplus equipment . . . ."

As to the policy concerning oil disposal, Mr. Anderson testified as follows: "We change the oil every so many hours depending on the size of the machine. And we take the used oil, put it into drums, send it back to [the home office]. And [ ] we use it to heat our shop, we recycle the oil."

Mr. Goff did admit that after completion of the fill work, he saw one of Construction Company's trucks hauling off tires. Convinced that Construction Company nevertheless buried tires and other items under the fill material, Mr. Goff testified that he hired Lloyd Shores Trucking and Excavation and asked them to dig in that area of the property. This first dig produced one "big" tire, which Mr. Goff described as being 8 feet tall by 24 inches wide. The excavation company dug a total of five holes that day and found another smaller, truck tire. The second dig occurred on June 17, 2006, and uncovered four additional truck tires of various sizes. Mr. Goff testified that the

second dig focused on an area of about a half acre of the fill area. They also uncovered two steel pipes.

When asked why six tires were found on the Goffs' property, Mr. Anderson testified that "I have no idea," nor could he say for sure where the tires came from: "it makes sense that they were ours but I don't know that. They could be [Mr. Goff's tires]." He did admit that Construction Company used tires like the ones buried on the property, but that he did not personally observe any of Construction Company's employees burying anything other than fill material. He admitted on cross examination that he was not on the site for the entire project, as he supervised various other projects during that time.

This discovery of tires prompted Construction Company to perform its own investigation. Michael Corn, an engineer with AquAeTer, Inc., conducted core sampling of the fill area. He testified as to the process of "boring," which he described as "pushing a probe down in the soil and taking soil samples." From these samples, he concluded that there were no hazardous materials or hazardous waste at the site. Mr. Corn testified that tires were not considered hazardous material. He testified that to his knowledge, a few tires and pipes buried on private property would not create a "problem with the Solid Waste Disposal Act."

Ken Johnson, a geologist employed by First Response, Incorporated, testified that upon the Goffs' request, he performed an initial evaluation of the property in the fall of 2003. Mr. Johnson testified that he saw on top of the ground a large oil filter from some type of large earth-moving

equipment on the property, along with two tires. As to the core sampling, he testified that it is a "very limited scope of exploration," and that the only way buried tires would be discovered using this method would be if the core barrel or the drill made contact with the buried tires. Mr. Johnson testified that the only way he would certify that there was not any solid waste left on the Goffs' property would be to excavate the entire fill area.[4] He estimated that this would cost six dollars a cubic yard, or $318,000. This estimated cost, however, depended on what, if any, types of materials would be uncovered.

On cross examination, Mr. Johnson testified that he did not observe any oil sheens on the property, nor did he have pictures of the oil filter or the tires that he observed on the property. He also testified that he did not make a recommendation that the Goffs dig up the entire fill area, but rather gave an estimate of what that procedure would cost. He admitted that tires are considered a nonhazardous waste.

William Parrish, a real estate appraiser, valued the fill area property at $50,000 upon the Goffs' request, assuming the property was free from any buried solid waste. Based on Mr. Johnson's aforementioned estimate, Mr. Parrish estimated the cost to cure the property at $375,000. Mr. Parrish testified that if the property has solid waste buried on it, then the value of the property would be zero, "[b]ecause under Tennessee law you have to disclose any latent defects of the property . .

---

[4] When asked about this, Mr. Corn testified that he believed it was unnecessary "to dig up all this fill material that had been placed there[,] . . . [because] we haven't found anything that would require that level of effort to dig up a site."

. . And as I see now, it isn't a really good fill for construction, large items in it, including large boulders as well as tires. It doesn't seem to be very stable as far as a building site."

Construction Company called Johnny Apple, the director of the division of solid waste management for the Tennessee Department of Environment and Conservation, as a witness. Mr. Apple testified that his department "didn't see anything unusual that would indicate [the need for] further investigation."

The jury returned a special verdict in favor of the Goffs as follows:

> 1. For breach of contract, the defendant, . . . shall pay unto the plaintiffs [ ]the sum of $5,355.50, as agreed by the parties. (The Court does reserve the calculation of pre-judgment interest).
>
> . . .
>
> 3. The jury did find that the damages suffered by the plaintiffs [ ] as a result of the blasting damage caused by the activities of the defendant was $9,510.00.
>
> . . .
>
> 6. The jury awarded damages in favor of the plaintiffs [ ] against the defendant for creating a nuisance upon the plaintiffs' property in the amount of $3,305.00.

The jury found for Construction Company as follows: "The jury found that the defendant had not caused any environmental hazard to the Goff property."[5]  As to punitive damages, the jury found "that the plaintiffs had proved by clear and convincing evidence that the defendant was guilty of such egregious, intentional or reckless acts that an award of punitive damages should be assessed against the defendant as punishment for its actions."

---

[5] The special verdict form and the final judgment refers to this claim as an environmental "hazard"; the jury instruction reads:

### Environmental Tort

It is unlawful to dispose of solid waste in violation of the *Solid Waste Disposal Act of the State of Tennessee*.  No solid waste processing facility or disposal facility or site in any political subdivision of this state shall be operated or maintained by any person unless such person has registered with the Commissioner . . . .

Whole waste tires, lead acid batteries, and used oil must be disposed of in a State approved site.

. . .

It is a violation of law for any person to knowingly cause damage to or the destruction of any real or personal property of another, knowing that the person does not have the owner's effective consent.

"Damage" includes but is not limited to: [A] Destroying, polluting or contaminating property; or [B] Tampering with property and causing pecuniary loss or substantial inconvenience to the owner or third person; and

"Polluting" is the contamination by man-made or man-induced alteration of the chemical, physical, biological or radiological integrity of the atmosphere, water, or soil to the material injury of the right of another.  Pollutants include solid waste, wrecked or discarded equipment, and industrial waste.

Plaintiff has the burden of proving by a preponderance of the evidence an environmental tort.

Although Construction Company did not raise this issue at trial or on appeal, we would point out that:

When violations occur, the [Tennessee Solid Waste Disposal] Act gives *the regulators* broad authority to stop the violation and to order steps to remedy or mitigate its effects. *The Act does not explicitly provide a private right of action for persons who have been damaged as a result of a violation.*  . . . Our interpretation of the scope of remedies available under the Act will not leave without recourse those who have sustained a special or peculiar injury from a violation of the Act. The same facts may support claims of both public and private nuisances[.] . . .

*Wayne County v. Tennessee Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 283 (Tenn. Ct. App. 1988) (emphasis added).  Although we need not answer, we question whether such a cause of action  labeled "environmental tort" is appropriate.

The second phase of the trial commenced on July 1, 2006. Mr. Anderson, Construction Company's chief engineer, was the only witness to testify during this phase. Construction Company's financial statements indicated that the company had a net worth of over $46 million for the year 2000; $50 million for the year 2001; $51.1 million for the year 2002; and $54.3 million for the year 2003. Mr. Anderson testified that during the project in question, Construction Company went through hundreds of tires. He reiterated that company policy "is to return those tires to [the home office] because you have to put [the tires] on a machine to see if [they] can be sectioned or recapped. You can't tell on a job." He also testified that because the project was with the State of Tennessee, if state inspectors witnessed Construction Company burying tires, which they did not, they would have penalized them or withheld payment for the project. He testified that the State of Tennessee did not cite or give any warnings to Construction Company for any improper conduct relating to the fill area.

The jury returned an award of $2 million in punitive damages against Construction Company: "We, the Jury, unanimously answer the questions submitted by the Court as follows: We find the defendant should be required to pay punitive damages in the amount of $2 million[.]"

On August 10, 2006, Construction Company filed a motion for a new trial and a motion to alter or amend the judgment, or in the alternative, remittitur. The Goffs filed a response in which they acknowledged that the judgment exceeded the *ad damnum* in their complaint, and thus did not oppose a $1 million reduction of the punitive damages award. The court granted Construction Company's request for remittitur, reducing the punitive award to $1 million "to conform to the

amount the plaintiffs sued for in their ad damnum[.]" The court denied Construction Company's motion for a new trial, setting forth findings of fact and conclusions of law. The court went through the analysis set forth in *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901–02 (Tenn. 1992), and approved the $1 million punitive award.

## II. ISSUES PRESENTED

Appellant presents several issues for our review, the majority of which deal with the award of punitive damages. We slightly reorder and consolidate the issues as follows:

1. Whether the record supports the award of punitive damages.

2. Whether the award of punitive damages is so excessive that it is in violation of Tennessee and federal constitutional due process.

3. Whether the trial court issued an improper jury instruction concerning punitive damages.

4. Whether the trial court erred by denying Construction Company's motion for a mistrial when the Goffs introduced evidence of insurance and settlement negotiations.

### III. STANDARD OF REVIEW

In this case, the trial court reduced the punitive damages award to conform to the *ad damnum*,[6] and then approved the $1 million punitive damages award. When the trial court approves the jury verdict in its role as "thirteenth juror," our standard of review is more deferential: we must affirm if there is any material evidence to support the verdict. Tenn. R. App. P. 13(d); ***Coffey v. Fayette Tubular Products***, 929 S.W.2d 326, 331 n.2 (Tenn. 1996) (citing *Ellis v. White Freightliner Corp.*, 603 S.W.2d 125, 129 (Tenn. 1980); *Benson v. Tennessee Valley Elec. Co-op.*, 868 S.W.2d 630, 640 (Tenn. Ct. App. 1993)). We review the trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

### IV. DISCUSSION

Construction Company raises several arguments concerning the punitive damages award. First, we will address its argument that the trial court incorrectly relied on the environmental tort in approving the jury's award of punitive damages, because the jury rejected that cause of action and declined to award compensatory damages on that basis.

---

[6] A trial court cannot enter a judgment in excess of the amount sought in the plaintiff's complaint. ***Hansen ex rel. Hansen v. Bultman***, No. E2001-02664-COA-R3-CV, 2002 WL 31780680, at *2 (Tenn. Ct. App. Dec. 13, 2002) (quotation omitted).

Our Supreme Court, in ***Hodges v. S.C. Toof & Co.***, 833 S.W.2d 896, 901–02 (Tenn. 1992), laid out the procedural framework for awarding punitive damages. First, the plaintiff must prove by clear and convincing evidence that the defendant acted (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly. ***Id.*** at 900–01. Upon such a finding, the jury must then determine the amount of damages during the second phase of the trial, taking into consideration the following:

> (1) The defendant's financial affairs, financial condition, and net worth;

> (2) The nature and reprehensibility of defendant's wrongdoing, for example[:]

> (A) The impact of defendant's conduct on the plaintiff, or

> (B) The relationship of defendant to plaintiff;

> (3) The defendant's awareness of the amount of harm being caused and defendant's motivation in causing the harm;

> (4) The duration of defendant's misconduct and whether defendant attempted to conceal the conduct;

(5) The expense plaintiff has borne in the attempt to recover the losses;

(6) Whether defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior;

(7) Whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act;

(8) Whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and

(9) Any other circumstances shown by the evidence that bear on determining the proper amount of the punitive award.

*Id.* at 901–02. The Court later explained in ***Metcalfe v. Waters***, 970 S.W.2d 448, 452 (Tenn. 1998), that the aforementioned factors "are also necessarily considered with respect to the threshold liability issue[.] . . . [O]nly evidence of a defendant's net worth or financial condition is deemed inadmissible in determining a defendant's liability for punitive damages." (citation omitted).

As to the evidentiary standard, clear and convincing evidence is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Goodale v. Langenberg*, 243 S.W.3d 575, 589 (Tenn. Ct. App. 2007). Clear and convincing evidence should "produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* (quoting *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App 2000)). Clear and convincing evidence means that the truth of the facts asserted is "highly probable," as opposed to the lesser standard of preponderance of the evidence, which is a "more probable" standard. *Id.*

The higher evidentiary standard helps limit the imposition of punitive damages to only the most egregious of cases. Furthermore, "it is well-settled that punitive damages are not intended to compensate an injured plaintiff but may be awarded by the jury for the purposes of punishing wrongdoers and deterring them from similar conduct in the future." *Coffey v. Fayette Tubular Products*, 929 S.W.2d 326, 328 (Tenn. 1996) (citing *Huckeby v. Spangler*, 563 S.W.2d 555, 558-59 (Tenn. 1978)). Compensatory damages are to "compensate an injured plaintiff for personal injury or property damage, but [punitive damages are meant] to punish a defendant, to deter him from committing acts of a similar nature, and to make a public example of him." *Emerson v. Oak Ridge Research, Inc.*, 187 S.W.3d 364, 372 (Tenn. Ct. App. 2005) (quotation omitted).

Relevant to this case is intentional and reckless conduct: the jury found that the Goffs had proven by clear and convincing evidence that Construction Company "was guilty of such egregious, intentional or reckless acts," and thus, punitive damages were warranted.

A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result. . . . A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances.

*Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992) (citations omitted). If the jury returns an award of punitive damages, then the trial judge must review the award, "giving consideration to all matters on which the jury is required to be instructed. The judge shall clearly set forth the reasons for decreasing or approving all punitive awards in findings of fact and conclusions of law demonstrating a consideration of all factors on which the jury is instructed." *Id.* at 902.

Turning back to the present case, Construction Company argues that the trial court incorrectly relied on the environmental tort in approving the jury's award of punitive damages, because the jury rejected that cause of action and declined to award compensatory damages on that basis. We agree. Construction Company goes on to argue that "[w]here there is a finding that plaintiff has suffered no actual damage (in this case under the environmental hazard claim), no punitive damages may be awarded." We disagree with this contention, however, because the jury found that the Goffs were legally injured and awarded actual damages based on the claim of nuisance. The trial court, however, discussed in great length the environmental tort claim as support for its decision to uphold the jury award of $1 million in punitive damages:

-18-

## 2. The Nature and Reprehensibility of the Defendant's Wrongdoing

. . . By intentionally burying tires eight feet tall, thirty-two inches in diameter, and weighing over one ton, the defendant clearly violated the solid waste disposal act. The policy of the state to avoid pollution and the creation of unpermitted landfills was intentionally violated on the lands of another and justifies a substantial punitive damages award.

. . .

## 4. The Relationship of Defendant to Plaintiff

. . . The defendant's intentional violation of the solid waste disposal act by polluting defendant's property . . . requires a substantial award of punitive damages.

## 5. The Defendant's Awareness of the Amount of Harm being caused and the Defendant's Motivation in Causing the Harm

The defendant was aware of state policy regarding landfills and pollution. The defendant knew how large tires were required to be cut up and shredded and then disposed of in an approved site. . . .

## 11. Any Other Circumstances Shown by the Evidence That Bear on Determining the Property [sic] Amount of Punitive Damages

-19-

The State of Tennessee has a strong and legitimate interest in preventing construction companies, especially construction companies being paid under contract with the state, from dumping or polluting property located within the state. Burying solid waste tires is a violation of Tennessee Solid Waste Disposal Act. Tennessee Code Annotated Section 68-11-866 and 867. For violation of the act, violators are subject to civil penalties of up to $5,000.00 per day. Tennessee Code Annotated Section 68-22-117. In addition, a violation of the act constitutes a Class B misdemeanor for each day the violation continues.

In this case, the violation of state policy and law was not discovered by the state in spite of the fact that DOT inspectors were on the fill area on a daily basis. State officials who testified at trial seemed to minimize the violations. The jury could have concluded, and the court does conclude, that if state policy of preserving the environment and enforcing penalties the legislature has proscribed for violation of the policy in this case, it was up to this jury to impose an appropriate penalty to punish the defendant . . . .

In this case, the only claim upon which punitive damages could be based upon is the nuisance claim, as the jury found Construction Company not liable for the environmental tort. Here, the Goffs focus on the expert testimony that the cost to clean the fill area would be $318,000, and

that the award of damages based on the nuisance claim "did not encompass the full harm the plaintiffs sustained. The harm to the plaintiffs goes beyond their legally recoverable damages." The Goffs' sought in their complaint recovery of "the costs and expenses of excavating, removing, and disposal of the waste materials buried upon the property." The jury, however, declined to make such an award. The trial court stated in its findings of fact that "the jury's compensatory damages award was very modest. The evidence would have supported a verdict of over $100,000." Whatever the jury's reasoning for the "modest" award, punitive damages cannot be used to make up for a low compensatory award.

The trial court's findings of fact and conclusions of law are insufficient in that they rely heavily on the environmental tort claim, a theory which the jury rejected. We therefore reverse the award of punitive damages and remand the case to the trial court. On remand, the trial court should apply the *Hodges* factors and make appropriate findings of fact and conclusions of law in approving or decreasing the award of punitive damages, if the court deems appropriate, based on the nuisance theory.[7] *See generally Emerson v. Oak Ridge Research, Inc.*, 187 S.W.3d 364, 374 (Tenn. Ct. App. 2005) ("Since the Trial Court failed to make such findings and did not conduct the proper analysis in this case, the issue of punitive damages is remanded and the Trial Court is directed to

---

[7] Construction Company does not raise issue with the award of compensatory damages based on the nuisance claim. Seemingly inconsistent, Construction Company's brief states that "[t]he only basis on which the jury could award punitive damages is on plaintiffs' nuisance claim, the only claim supported by compensatory damages[.]" Construction Company later argues, however, that "[n]uisance is not the type of damage for which punitive damages were contemplated in this case." Apparently Construction Company is arguing that the nuisance jury instruction did not mention punitive damages. This argument has no merit, as the separate jury instruction concerning punitive damages stated: "You may consider an award of punitive damages only if you find that the plaintiff has suffered actual damage as a legal result of the defendant's fault and you have made an award for compensatory damages for either an environmental tort or nuisance."

comply with the requirements of *Hodges* and *Culbreath*.").  Because of our holding, we need not address Construction Company's constitutional argument regarding the excessiveness of the award.

### B.  Jury Instruction: Punitive Damages

Next, Construction Company argues that the trial court erred in instructing the jury on the issue of punitive damages.  Construction Company points to two alleged errors here: (1) the fact that the court did not instruct the jury that punitive damages "are only proper in egregious circumstances" and (2) "where [the court] charged intentional or reckless conduct as the basis for punitive damages where  [the Goffs] pled only intentional and fraudulent conduct."

We review jury charges in their entirety in order to determine whether the trial court committed reversible error. *Godbee v. Dimick*, 213 S.W.3d 865, 880 (Tenn. Ct. App. 2006) (citing *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 446 (Tenn. 1992)).  "A verdict will be reversed if it can be shown that an instruction contains an inaccurate statement of the law or is confusing and, considering the charge of the court as a whole, that the error was not harmless, i.e. that the instruction more likely than not affected the outcome of the trial." *Id.* (citations omitted).

As for the instruction concerning punitive damages, Construction Company sought the inclusion of the following: "Punitive damages are to be awarded only in the most egregious of cases."  The trial court declined to include this proposed addition.  We first point out that "[t]he fact

-22-

that a special request for jury instruction asserts a correct rule of law does not make it proper jury charge material." **_Godbee v. Dimick_**, 213 S.W.3d 865, 881 (Tenn. Ct. App. 2006) (citations omitted). The jury instruction read, in part: "The purpose of punitive damages is not to further compensate the plaintiff but to punish a wrongdoer and deter others from committing similar wrongs in the future." The instruction complies with **_Hodges_** and we find no error here.

Construction Company next argues that it was error to add the term "reckless" to the punitive damages jury instruction when the Goffs pled "fraudulent." A jury instruction should "reflect the theories that are supported by the parties' pleadings and proof, as well as the parties' claims and defenses." **_Goodale v. Langenberg_**, 243 S.W.3d 575, 584 (Tenn. Ct. App. 2007) (citing _Cole v. Woods_, 548 S.W.2d 640, 642 (Tenn. 1977)).

The instruction read: "Punitive damages may be considered if, and only if, the plaintiff has shown by clear and convincing evidence that a defendant has acted either intentionally or recklessly." As Construction Company points out, the Goffs pled only intentional or fraudulent conduct. This argument was raised in Construction Company's motion for a new trial, but it does not appear that any specific objection was raised to that part of the instruction during trial. And as the Goffs point out, Construction Company's counsel referred several times throughout the trial to its alleged "reckless conduct." Rule 15.02 of the Tennessee Rules of Civil Procedure provides:

> When issues not raised by the pleadings are tried by express or
> implied consent of the parties, they shall be treated in all respects as

-23-

if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

"The determination of whether there was implied consent rests in the discretion of the trial judge, whose determination can be reversed only upon a finding of abuse." *Zack Cheek Builders, Inc. v. McLeod*, 597 S.W.2d 888, 891 (Tenn. 1980) (citation omitted). In this case, the trial judge determined that a punitive damages charge based on intentional and reckless conduct was needed based on the evidence presented, and that there was no evidence from which the jury could find that punitive damages should be imposed based on Construction Company's fraudulent conduct. We cannot say that the lower court abused its discretion in making this decision.

### C. Evidence of Insurance and Settlement Negotiations

Finally, Construction Company argues that the trial court should have granted its motion for a mistrial because "where the compensatory damages were so minimal while the punitive damages were so excessive, it is likely that the jury did recall the reference to insurance in deciding the monetary awards[.]"

"It is well settled that the decision of whether to grant a motion for mistrial is within the sound discretion of the trial court." ***Willis v. Settle***, 162 S.W.3d 169, 188 (Tenn. Ct. App. 2004) (citing *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996)).  Absent an abuse of discretion, we will not disturb the trial court's decision to deny a motion for mistrial.  *Id.* (citations omitted).  The trial court should grant a mistrial if reference to liability insurance was made wilfully for the purpose of influencing the jury. ***Terry v. Plateau Elec. Co-op.***, 825 S.W.2d 418, 422 (Tenn. Ct. App. 1991) (citation omitted).  We find no proof that such mention of insurance affected the result of the trial, or that the Goffs' counsel willfully and voluntarily referred to insurance in order to influence the jury.  *See* ***McClard v. Reid***, 190 Tenn. 337, 340, 229 S.W.2d 505, 506 (Tenn. 1950) ("[I]t is more or less a question for the trial court, to exercise his discretion on, as to whether or not the plaintiff has deliberately injected the insurance question to the prejudice of the defendant."); ***Ailor v. City of Maynardville***, No. 03A01-9605-CV-00158, 1996 WL 722041, at \*4 (Tenn. Ct. App. Dec. 17, 1996).  Although the curative instruction did seem to emphasize the point that Construction Company did indeed have insurance, we cannot say that the trial court abused its discretion in refusing to grant Construction Company's motion for a mistrial.

## V.  CONCLUSION

As discussed, we reverse the award of punitive damages and remand that issue to the trial court.  We affirm the decision of the trial court on the other matters.  Costs of this appeal are taxed to Appellant, Elmo Greer & Sons Construction Co., Inc., and its surety, for which execution may issue if necessary.

-25-

_____

ALAN E. HIGHERS, P.J., W.S.